JUNIUS E. BEAL AND PHOEBE B. BEAL, EXECUTORS, ETC.,
v. JAMES M. CONGDON ET AL.

*Fraud—Bill to restore discharged mortgage—Evidence—Laches.*

1. A party defrauded must be vigilant in protecting himself, and prompt in complaining.

2. It would be contrary to all rules of propriety to assume, without proof, the existence of fraud, when if it existed it could be proved by a witness put on the stand as reliable by complainants, and not asked about it.

3. In this case, upon a review of the testimony, the fraud charged is held not established, and the decree below dismissing complainants' bill is affirmed; SHERWOOD, C. J., dissenting.

Appeal from Washtenaw. (Joslin, J.) Argued April 10, 1889. Decided June 7, 1889.

Bill to restore into validity a discharged mortgage, on the ground that the discharge was procured by fraud. Complainants appeal from decree dismissing bill. Affirmed. The facts are stated in the opinion.

*Sawyer & Knowlton,* for complainants.

*M. J. Lehman,* for defendant Weaver.

*D. B. Taylor,* for defendants James M. and Sarah E. Congdon, Bacon, and Whipple.

*G. W. Turnbull (Edwin F. Conely,* of counsel), for

defendants Thomas and Roxa M. Wilkinson, Stedman, French, Cassidy, and Steinbach.

CAMPBELL, J.   The bill in this cause was filed in the circuit court for the county of Washtenaw to restore into validity a discharged mortgage, on the ground that the discharge was procured by fraud.   The case made by the bill, so far as necessary to explain the issues, was this:

In January, 1880, James M. Congdon and his wife, Sarah E. Congdon, gave to Rice A. Beal a mortgage to secure $7,350, and interest, in a note given by James M. Congdon. This mortgage covered 305 acres of land in the township of Sylvan, in Washtenaw county, some adjoining and near Chelsea, and the remainder in the same vicinity, but not joining the rest.   There were eight different descriptions, lying as nearly as can be drawn from the bill, in three groups.

In February, 1882, Congdon and wife conveyed to defendant Roxa M. Wilkinson a single parcel lying north of the territorial road, and west of the highway leading to Chelsea. The size of this and its value do not appear, as the conveyances are merely recited in a stipulation.   On the same day, Congdon and wife conveyed to Thomas Wilkinson all of the remaining parcels.   Each of these deeds was made subject to the Beal mortgage, which the grantees were to agree to see paid.   Among the mortgaged lands were the west half of the north-west quarter of section 14, and the south 60 acres of the east half of the north-east quarter of section 15 which were contiguous parcels separate from all the rest, and containing 140 acres, which will be material to this controversy as the lands sold to Bierce.

In September, 1882, and May, 1883, Rice A. Beal released two parcels of land from the mortgage.

He died in October, 1883, leaving his wife and adopted son his executors.

In November, 1883, Wilkinson paid Beal $400.

In December, 1883, the transactions began which have led to this dispute. In that month Thomas Wilkinson sold and conveyed to defendant George E. Bierce the 140 acres before referred to for a nominal sum of $4,900. Bierce gave back a mortgage of $2,500, to stand as the first mortgage. He gave, also, a mortgage for $1,750 to Wilkinson, to stand as a second mortgage. There is some dispute about the remaining $650, but it appears to have been arranged by notes not secured by mortgage.

At this time Wilkinson paid complainant Junius E. Beal $1,500 in money, and assigned to him the mortgage for $2,500 given by Bierce on the 140 acres. Beal indorsed $4,000 on the Congdon mortgage, and released the 140 acres from the Congdon mortgage, retaining the $2,500 security given by Bierce on the same land. This transaction is relied on as fraudulently managed by Wilkinson.

On the twenty-sixth of August, 1884, Thomas Wilkinson paid Junius Beal the remainder of the Congdon mortgage, being $4,188.35, and Beal discharged it in full of record.

In May, 1885, complainants filed this bill, claiming that they were defrauded into taking the $2,500 as so much payment, and asking to have the Congdon mortgage reinstated and set in force to that amount.

The money which constituted the final payment of $4,188.35 was borrowed, and was secured by mortgages,—one to defendant Cassidy for $3,000, and the other to defendant Mary L. French. Some parcels of land have also been sold to purchasers.

The bill relies upon fraud, which is substantially set forth in this wise: The 140 acres deeded to Bierce are alleged to be of small value, and no security for $2,500. The bill claims that Thomas Wilkinson went through a sham sale with Bierce to create a fictitious idea of the value of the land, and caused Junius Beal to believe the property was worth the amount of $4,900, named in the deed to Bierce; that, by this

means, Junius Beal was induced to take the $2,500 mortgage as collateral to the Congdon mortgage, and release the 140 acres from the latter; that in August, 1884, by keeping up the same fraudulent show, Beal was induced to discharge the entire Congdon mortgage, and accept the $2,500 as payment, instead of holding it as collateral. The fraud is sought to be made out by showing Bierce's financial condition, and his .version of the sale to him, and by showing the character of the 140 acres as land of no value.

The court below dismissed the bill, and complainants appeal.

There is a good deal of conflict in the testimony. The bill is not, as strictly it should have been, sworn to; and it is not drawn upon the same theory in all respects which is now relied on, but complainants claim there is no absolute variance, or, at least, none precluding relief. We are not told on what grounds the bill was dismissed; but the testimony is, in important respects, so discordant as to raise issues of fact, on which, according to the rules of pleading and evidence, complainants had the burden of proof laid on them.

It is evident from the face of the bill that, on its theory, there could have been no fraud committed in December, 1883. By that transaction, as claimants claim it to have been, complainants received absolute payment of $1,500, which they now claim was more than the 140 acres were worth, and at the same time received a mortgage for $2,500 on the same land which was released, and which they claim was much more than its value. If this mortgage was held as collateral, instead of losing anything by the release, they were at least $1,500 better off for making it. And they do not claim that, at this time, anything was said concerning a future release of the balance of the Congdon mortgage, which, according to this theory, was still in force to the amount of $6 500. And, yet, the whole theory of the bill is that this sham sale was left working on the mind of Junius Beal until eight months

thereafter, in August, 1884, when it was used by direct representation and urgency to induce him to discharge the entire Congdon mortgage of $6,500, and take the $2,500 mortgage as so much cash on that occasion. This theory postpones the commission of the fraud for eight months, and renders the delay in filing the bill in May, 1885, nine months instead of seventeen months after the fraud.

As a matter of fact, which is left beyond dispute by the documents (although Mr. Beal swears that he did it under a mistake almost at once discovered), the assignment of the $2,500 mortgage to Mr. Beal, in December, 1883, was accepted as equivalent to a cash payment, and the Congdon mortgage was indorsed down by the whole payment of $4,000, leaving only about the same amount thereafter payable. If there was any fraud, it was then, and not afterwards. When the payment in full was made, in August, 1884, there is no evidence showing any fraud or any occasion for fraud. Wilkinson paid all that was due on the Congdon mortgage as a matter of right, and it was discharged at once as a matter of course.

This entirely changes the theory of the bill, and does so in such a manner as to very seriously affect the equities. If the $2,500 mortgage was intended as collateral security, and not payment, and the indorsement of it as payment was a mistake, Beal testifies that he at once discovered it, and never at any time thereafter complained of it, or even referred to it when he made a discharge in full of the Congdon mortgage, in August, 1884, when he took the final and decisive step, and when there is no proof that he was deceived or cajoled into accepting the mortgage then for the first time as a payment. At that time the money payment was treated by every one as all that was due. It is clear to our minds that the case made by the bill is not proved.

But, upon the theory that there was fraud in getting the

$2,500 allowed as payment in the first place, if we can consider it as before us in proper shape, it is necessary to examine carefully the precise question presented, and that is whether complainants were fraudulently misled by Wilkinson to their injury.   And this requires—

1. Fraudulent deception.
2. The acceptance of a security which is not worth what it purported to be worth.

A third condition also must not be overlooked, which is that a party defrauded must be vigilant in protecting himself, and prompt in complaining.

In the present case, while Mr. Beal's testimony as first given is to the effect that he supposed the $2,500 was to be merely collateral, he also admits that he discovered almost immediately that the papers all made of it an absolute payment, and further that he never at any time attempted to have the mistake, if it was one, rectified.   But, as already suggested, there was no reason for being particular about this arrangement, or hesitating to release the 140 acres, if it was not a payment.   As a matter of fact, it cannot be doubted on this record that the mortgage was actually received as a payment for its face, and when the payment of the remainder of the Congdon mortgage was made, in August, 1884, no one disputed that it had been reduced to that extent.

Whether any fraud was committed in getting Mr. Beal to receive the $2,500 in payment is the question that complainants' counsel have been led to argue as the chief question in the case.   Upon this it appears beyond controversy that Junius E. Beal refused to rely on the representations of Wilkinson, express or implied, and insisted on having the propriety of accepting the proposed arrangement determined by an examination to be made by his uncle, Eugene E. Beal; and it was accepted on his approval.   There is some allegation bearing on some supposed misleading of Eugene E. Beal But, if any such thing took place, which is denied, it devolved

on complainants to show it. It appears from the record that Eugene E. Beal was living, and accessible as a witness. He was actually put on the stand by complainants to impeach Wilkinson as to some particular remarks which he denied to have been made. But, although on the stand, he was not asked by complainants any question whatever as to his examination of the premises, and its circumstances. It would be contrary to all rules of propriety to assume, without proof, the existence of fraud, when if it existed it could be proved by a living witness put on the stand as reliable by complainants, and not asked about it.

Whatever may have been the occasion or purpose of the sale to Bierce, whose testimony does not seem very convincing, the only pertinent inquiry concerning the 140 acres is as to the value of the $2,500 mortgage, and whether it was so grossly deficient as to make fraud certain. Even if the approval of Eugene E. Beal should not be absolutely conclusive, there is very strong evidence that the land was more valuable; and, had complaint been made promptly and consistently, it is not clear that a case would be made out against the original parties, while now the honest claims of others stand in the way. As the case is now presented, and with an entire failure to examine Eugene Beal on what was, if true, within his personal knowledge, we are not disposed to question the correctness of the decree below as against complainant; and, as defendants do not appeal, the decree will be affirmed, with costs.

CHAMPLIN and MORSE, JJ., concurred with CAMPBELL, J.

SHERWOOD, C. J. I think the complainants were entitled to the relief prayed for in the bill, and that the defendants were guilty of the fraud charged, and that the decree should be reversed.

LONG, J., did not sit.