KUPFER v. MICHIGAN CLOTHING CO.

1. SALES—GOODS—QUALITY—DEFECTS—RETURN.

Where, during a correspondence between a seller and buyer of goods, with reference to some that had proven defective, the seller stated that he was willing to take back any unsatisfactory goods, if in the same condition that they were delivered, the buyer was authorized to return goods only for some reasonable cause.

2. SAME—SALE BY SAMPLES.

Where an order for goods from samples is filled by the delivery of goods equal to the sample, the buyer is bound to be satisfied and cannot reject them for defects in quality.

3. SAME—QUALITY OF GOODS—EVIDENCE.

In an action for the price of goods sold by sample and rejected by the buyer, without inspection, because of alleged defects in quality, it is error to allow the jury to find that defendant had a right to reject them because of the unsatisfactory character of other goods bought of plaintiff, where there is no evidence that the goods were similar in quality.

4. SAME—INSPECTION—SATISFACTION.

An agreement that goods sold shall prove satisfactory necessarily implies a reasonably prompt inspection on the part of the buyer, where no period of time is specified.

5. SAME—REJECTION—BURDEN OF PROOF.

Where goods were sold under an agreement that they should prove satisfactory, the burden is on the buyer to show that goods rejected were legally unsatisfactory.

6. SAME—QUALITY OF GOODS—EVIDENCE.

A buyer cannot establish his right to refuse acceptance of goods sold under an agreement that they should be satisfactory by merely showing that other goods received under similar circumstances were unsatisfactory.

7. SAME—RETURN—SUBSEQUENT ACTS OF OWNERSHIP.

Where, after a buyer has returned goods as unsatisfactory, and notified the seller that the goods are refused and are at the seller's risk, he again orders the railroad company holding the goods to return them to him, such direction constitutes an acceptance of the goods.

Error to Ionia; Davis, J.   Submitted June 23, 1905. (Docket No. 65.)   Decided September 19, 1905.

Assumpsit by Henry Kupfer and Harold W. Kupfer, copartners as Henry Kupfer & Co., against the Michigan Clothing Company for goods sold and delivered.   There was judgment for defendant, and plaintiffs bring error. Reversed.

*Knappen, Kleinhans & Knappen*, for appellants.

*R. A. Hawley*, for appellee.

BLAIR, J.   Plaintiffs are dealers in corduroys, and this action was brought to recover for certain corduroys sold to defendant under a contract entered into by correspondence.   On December 1, 1899, one Costuma, a salesman of plaintiffs, sent to defendant a full list of samples of corduroys; each sample being numbered to denote its quality. All orders thereafter given by defendant were by such numbers.   On December 28, 1899, defendant sent in an order for some 12,000 yards, which was not accepted in terms on account of the times specified for deliveries. After some further correspondence, defendant soon after, January 22d, 1900, sent in an order as follows:

"You can ship us 2 pcs. of the No. 920.   Wish you would send some No. 940 at once, too."

This order was filled, and nine further invoices were afterwards shipped to defendant.   All invoices, up to and including the one of April 16th, were paid.   The invoices of June 11th and July 27th were returned and accepted by plaintiffs.   The invoices of May 1st, 12th, and 18th, and June 19th, were returned by defendant.   Plaintiffs refused to receive them, and it is for their price under the contract that this action is brought.

Prior to January, 1900, defendant had never had any trouble with plaintiffs' goods.   During January and February of 1900, and subsequent months, clothing manufac-

tured from plaintiffs' cloth was shipped back to defendant by its customers. On February 8, 1900, defendant by letter called plaintiffs' attention to that fact, saying:

"We have quite a few complaints on No. 920 fabric. Should this be so?"

On February 10, 1900, plaintiffs replied:

"As far as we know, the 920 quality is fully up to standard, and we are selling this cloth largely, and have never had any complaints regarding them. We cannot, therefore, understand why those delivered to you should not have been all right."

On March 5, 1900, defendant wrote to the plaintiffs as follows:

"We are being flooded lately with complaints regarding corduroy garments made from your goods. Until the past sixty days we never had any complaints to speak of, but lately we are receiving them very often. We incline to the opinion that they are just. We inclose you samples of the letters, and also send you samples of garments returned."

On February 28, 1900, the defendant also wrote the plaintiffs as follows:

"Your goods with us are turning out in bad shape. We inclose you a sample batch of letters, and send you by express a sample lot of trousers. Please say to us how this seems to you."

At the time of sending the letters of February 28th and March 5th, defendant inclosed sample letters from retail customers, and also sent by express samples of garments returned. The trouble with the corduroys was that they were tender. The most of the goods that were returned were made up out of qualities 940, 950, 955, 960, and 965. On May 23, 1900, Reynolds & Co. returned one dozen pants, $40; on July 1st, Schmidt & Son returned eight pair of pants, $14; on July 13th, L. Habercorn returned five pair of pants, $10; on November 19th, C. A. Thum returned two dozen pairs of pants, $50. On account of

the defective quality of plaintiffs' cloth, defendant lost customers, and some customers deducted from the amounts that were due for defective goods that were not returned at all. The garments that were returned had been manufactured out of tender cloth, and were of no value, and were of the better grade of goods, from 940 to 965.

On March 7th plaintiffs wrote defendant, saying:

"Please let us know just what your claim is, giving, if possible, piece number of the pieces from which the damaged garments were made, and we will submit the same to the mill."

On March 10, 1900, defendant replied to plaintiffs' letter of the 7th inst. as follows:

"We can't give the piece numbers from which goods were cut. Neither do we know how many goods are out that will be returned to us. We can't cut these goods if they are going to turn out in this way. It would soon ruin our trade completely. The only way, we think, to be fair, would be to keep a record of goods on which we have to make allowance, either submitting to you the garments returned or else the correspondence to you. While it is a serious matter to us, we think we ought to be made right for our actual loss. We have got to have cords that we can fully guarantee.

On March 12th plaintiffs wrote to defendant, as follows:

"Henry Kupfer & Co., Importers, etc.

"All claims must be made within five days after receipt of goods. No claims allowed after goods are cut or sponged.

"March 12, 1900.

"Michigan Clothing Co.,
          "Ionia, Mich.

"Gentlemen: We have to hand your favor of the 10th inst. and contents of same are duly noted. We have gone into the matter of an allowance on the corduroys, which you claim are tender, with the mill, and the outcome is that they, claiming that the goods are not tender and are fully up to the standard, will make no allowance whatsoever.

"The main cause for dissatisfaction, judging from the specimen trousers which you sent us, seems to be that the

buttons rip out, tearing the corduroy with them. The three pairs of trousers which show this give every evidence of having been worn a long time; but, aside from this, had they been made up in the manner in which it is customary to have these, i. e. with a cross top band, we do not think that this would have occurred. As to the pair in which the seat has been ripped, this has the appearance of having been done with the wanton intent of tearing it, and there is no material, and especially no corduroy, which will not rip after once being started, in the manner which this evidently was.

" The 920 quality is a cloth made out of selected three-ply yarn, and as far as strength is concerned it is as strong a corduroy as can be made, and as compared with goods of which you submitted a sample, and which is a very poorly made cloth, ours is a far stronger and better fabric. In conclusion, we will add that the mill which supplies our corduroy is the very best in this country, and none other can produce the finished goods which they turn out, and as every piece is carefully tested before leaving their premises, and as the trade has accepted their goods as standard, no complaints, such as you have made, are in order, and we can only say that we consider your customers unreasonably critical.

" Very respectfully yours,
" HENRY KUPFER & CO.

"P. S. Our position towards you is the same as that of the mill towards ourselves. It is our rule to make no allowance after goods are cut, unless the mill in turn indemnifies us, and we give warning to that effect by the superscription on our bill heads. You state that you must have corduroys that you can guarantee. In this connection, we would state that we sell the goods upon their merits and we can guarantee nothing. This is as liberal a scope as we are allowed, and we stand quite prepared to cancel your order if you cannot see your way to accept deliveries on this basis, and which, we may remark, is one established not only by ourselves, but by all others who handle the class of goods in question.

" We are at all times perfectly willing to take back any unsatisfactory goods, if in the same condition that we delivered them."

On July 12th, defendant received the following letter from a customer:

"L. Habercorn & Co.,
"Merchant Tailors and Gents' Furnishing Goods.
"431 Main Street.
"Fond du Lac, Wisconsin, July 10, 1900.
"Michigan Clothing Co.,
"Ionia, Mich.

"Gentlemen: We have returned a pair of pants, of lot 4009. This is the fifth pair which was returned to us in that way. We are losing trade through these pants. We have five pairs of pants of that lot on hand yet. Please let us know whether we can return them or not, as we do not care to spoil our trade on account of these pants. The pair we return to you were only worn four days, and the customer wants us to return the money or get him a new pair of pants. So please let us know what we should do with them, and oblige.

"Yours truly,
"L. Habercorn & Co.

"P. S. When will our last order be shipped?"

Defendant's manager, Preston, testified:

"When this letter of Habercorn came, this thing was keeping up, and I called the superintendent down, and told him not to unpack the last two shipments we had received from them—they hadn't been unpacked yet—and take every whole piece of their better grade of corduroy. I ordered them to return everything we had unpacked of every whole piece of goods that were in original packages and ship them by freight to Henry Kupfer & Co., New York.

" Q. Do you remember receiving a shipment that was sent on from New York on June 19th, the invoice bears date?

"A. Yes, those had never been unpacked. They were in the boxes nailed up as they were sent by the company.

" Q. What was done with these boxes of goods by you?

"A. We delivered them to the Grand Trunk Railroad Company.

" Q. Had them shipped back?

"A. Yes, sir.

" Q. Do you remember what other goods were shipped back besides that shipment of June 19th?

"A. I could tell from the memorandum, I guess.

" Q. Refreshing your recollection by the use of that memorandum, can you state what goods were shipped back?

"*A.* One piece 940 brown corduroy, aside from the 940 brown corduroy that was in the shipment of June 19th. We shipped them 576 yards.

" *Q.* You say 940 drab.

"*A.* Yes.

" *Q.* How many yards?

"*A.* 76 yards.

" *Q.* What order was that in?

" *Counsel for Plaintiff:* What date was that returned?

"*A.* Returned on the 15th of July; received by us on invoice of 1st day of May. The next is 950 drab corduroy. Defendant shipped them back 576 yards; 960 drab, shipped 153 yards, two pieces; 965 drab, shipped them 153 yards, two pieces. All of these were whole pieces; never been cut or touched; wrappers never been removed by defendant. They were in the original condition they had been received. Those numbers of yards specified were all that were returned, except the shipment of June 19th, which was returned in full. Those were out of other shipments.

\*    \*    \*

"They are folded different than most goods, they come folded in that way and over, back and forth, just like that (illustrating). They are done up with a string, and two ribbons run lengthwise, then a paper wrapped around, then across, run twice or three times around them, in this way. After these pieces of corduroy are tied with ribbons, then paper is wrapped around each piece; then they are tied with a heavy cord. Each of these several pieces of corduroy that were returned by us were wrapped in that way and had never been opened by defendant, never cut. Defendant had some of these goods on hand that had been cut, but which were not returned because they weren't in the original condition and weren't covered by their offer of March 12th. Defendant only returned just what were in the original condition they received them in. The reason or cause of the dissatisfaction of defendant with these goods that were returned was they weren't giving satisfaction to their trade. They were proving tender. Couldn't sell them at the prices they were buying them at and sell them out, because they couldn't guarantee them. They had to stand behind them, as those letters indicated, and could not use them, and under the offer of March 12th returned them, because they weren't satisfactory."

After defendant returned these goods on July 15th, defendant wrote the letter of July 15th.

"*Q.* Anyhow, you returned them to the city of New York?

"*A.* Yes, sir. .

"*Q.* How were they addressed?

"*A.* Henry Kupfer & Company, their street address, 81 Greene street, N. Y."

The letter of July 15th was as follows:

"IONIA, MICH., 7—15—'00.

"H. KUPFER & CO.,
        "New York.

"*Gentlemen:* We are obliged to return you some of your better grades of goods, which are not proving satisfactory to our trade at the prices. We regret to do this, and ask you to charge us with freight.

"Yours,
        "T. B. PRESTON."

Among others, the following letters passed between the parties:

"July 21, 1900.

"MICHIGAN CLOTHING CO.,
        "Ionia, Mich.

"*Gentlemen:* We today received a notice from the Delaware, Lack. & W. R. R. that a lot of four cases of corduroys had arrived consigned to us, and that if not removed within 24 hours they would be stored at the risk and expense of the owner. As this notice presumably concerns you, we send it to you. We think it very much out of the ordinary that you should venture to return such a lot of goods without first obtaining our consent and without giving us any particulars.

"Yours respectfully,
        "H. KUPFER & CO.

"P. S. The goods will remain at your disposal."

"IONIA, MICH., 7—24—1900.

"H. KUPFER & CO.,
        "81 Greene St., New York.

"*Gentlemen:* Yours 21st inst. Our Mr. Preston left yesterday for a two weeks' trip in Colorado, and as he has charge of all matters connected with your house, we ask

you to kindly take the goods represented by the inclosed notice out of storage and hold for us till he returns, when he will take the matter up with you. Thanking you in advance for your kindness,

"Very truly yours,
"MICHIGAN CLOTHING CO.,
"BENEDICT."

"July 26, 1900.
"MICHIGAN CLOTHING CO.,
"Ionia, Mich.

"*Dear Sirs:* Your favor 7—24 inst. is rec'd. The goods which you returned had already been stored and it is customary to charge not less than one-month for any lot. It cannot make any difference to you whether they are left or not during the period stated as Mr. Preston's absence. Your risk is in case of fire, and we could not cover you in the absence of any memo. or information as to the value of the contents, respecting which we have not the least idea.

"Respectfully,
"HENRY KUPFER & CO."

"August 11, 1900.
"MICHIGAN CLOTHING CO.,
"Ionia, Mich.

"*Gentlemen:* We return check received in yours of the 9th inst., as we cannot accept any such settlement as you intend with it. Your refusal to take any notice whatever of our recent correspondence regarding your unjustifiable course in dumping upon us a lot of goods, which you had ordered and received about three months ago, needs no comment, nor will you expect us to fill any more orders, if we are exposed to the risk of similar treatment after we have executed them. We regret that we must decline to take back the corduroys represented by your deduction of $503.05, and which, as business men, you must admit to be an arbitrary action on your part. At the same time, we expect to receive the full amount of bills due by return mail.

"Respectfully,
"H. KUPFER & CO.

"P. S. We call your attention to the fact that the goods returned are at the R. R. depot, never having been received by us. We understand that they charge high storage rates."

"IONIA, MICH., 8—13—'00.

"H. KUPFER & Co., N. Y.

"*Gentlemen:* Yours 11th inst. In investigation of matter, we fail to find letter from you of acceptance of order or promise to fill same. Please advise us of the date of such letter. We were of the opinion that some numbers had not been shipped at all, and we can find no letter of explanation of why. Without going into the merits, we should think, offhand, if you took liberty to not ship part, we could take liberty of returning part. Would that be right or not?

"Yours,
"T. B. PRESTON."

"NEW YORK, August 15, 1900.

"Mr. T. B. PRESTON,

"Secretary and Treasurer Michigan Clothing Co.,
"Ionia, Mich.

"*Dear Sir:* Yours of 8—13 received. After you have received and accepted ten or more shipments on account of your order, it is rather late to quibble about having received any formal confirmation of same. You certainly do not need to be enlightened on the weakness of such a defense. The goods in controversy were in your possession some three months, and you cannot, in law or in equity, set up any claim as to this. If you so desire, we will take them out of storage and try to sell them for your account at such prices as you may limit and without charging you more than actual cost of selling for this service, but the only condition precedent to this is remittance in full for all overdue bills, and at once.

"Yours, etc.,
"H. KUPFER & Co."

"IONIA, MICH., 9—19—'00.

"H. KUPFER & Co.,
"New York.

"*Gentlemen:* The goods contained in the four cases of corduroy are at the Pere Marquette depot at Ionia, Mich., subject to your order: The goods contained in the same are the goods invoiced you as 7—12, $503.25, and the shipment made by you 6—19, $494.75, returned on arrival. Check herewith inclosed, $112.83, is the check sent you 8—9 to balance as per statement inclosed. Your failure to fulfil your part of contract and ship goods as ordered made it proper for us to return portion of goods

unsatisfactory to us.  This will close all correspondence on our part.

"Yours,

"T. B. PRESTON."

The goods in question were ordered back to Ionia through the instrumentality of the defendant, by the following order:

"IONIA, 9—11, R.

"DAWLE:  Please have shipment four cases corduroy for Kupfer & Company, New York, 81 Greene Street, covered by Ionia to New York Great Eastern Line, bill 60, July 12, returned to Michigan Clothing Company, Ionia, Michigan.  I hold bill of lading.  Hurry please.

"WALLACE."

Mr. Preston testified as to the examination of the returned goods, as follows:

"*By the Court:* Do I understand, Mr. Preston, that two of these boxes you opened—the two you sent back were opened sometime?

"*A.* No, sir; they weren't opened at all.

" *Q.* Two sent back without opening?

"*A.* The two sent back were not.  The others were goods we had had in the storeroom maybe 30 days.

" *Q.* Those had never been unpacked?

"*A.* They hadn't been taken out of the original papers they came in.

"That is all."

On cross-examination witness testified they had been taken out of the boxes.  The goods were not examined or inspected.  The papers had never been taken off from them.

" *Q.* Whose duty was it?

"*A.* Nobody's.  We took the goods, accepted them, and never examined them.  We took it for granted they were all right unless something developed that they were not.

" *Q.* It would be your duty, if anybody's?

" *A.* I was too busy to go and examine every case or piece of goods that came in, test it, and examine it to see whether it was all right or not."

Witness testified that he could not always determine in

regard to tenderness by an examination of it. For instance, you might examine the end of a piece that would be all right, and not when you get into the middle of the piece. You might test it every time one of these little ridges comes. One side of the piece might be perfectly good, and the other side of the piece not. In an examination one might strike every part of the piece that would be perfectly good, and omit an examination of that part of a piece that would be tender. Have to rely upon the representation of the manufacturer and upon his good intentions. It would be just like an examination of the kernels in a bushel of corn to see whether they were good or not. Witness testified that his attention was called to some of the goods returned. He examined the goods Habercorn returned. He remembers particularly. Some of those he did not know.

" *Q.* Did you discover from those this tenderness ?
"*A.* Just take and tear it right down, you know.
" *Q.* That could have been found by examining it in the piece ?
"*A.* It would have been found very easily, if we had struck the locality in the piece. Examine just that locality, yes, we would have found it."

That the only way of testing corduroys would be to go through and examine every yard and every particle of the width of them; but no manufacturer would do that, nor could do it. They have to depend upon the reputation of the people that deliver the stuff to them.

Defendant's witness Benedict testified that he had examined all of the goods returned by customers, and that those that were damaged had been worn a day or two and goods proved tender. No rip in the seams at all, but in the goods themselves. They proved tender and were returned for that reason, and were good for nothing only rags; worthless for commercial purposes. By taking the goods through one's hands, you could very easily tell that the textile of the goods was faulty.

" *Q.* That could have been determined before they were sent out by your company ?

"*A.* If we had any idea that the goods were defective.

" *Q.* If you had examined the cloth, it would have shown, wouldn't it ?

"*A.* Not unless you had gone at it particularly to find out such a thing.

" *Q.* I say the goods that had never been used at all, simply made up. You say you discovered some faulty condition ?

"*A.* Same condition as to those. If they had been worn at all, they would have torn them the same as those that had been worn.

" *Q.* The goods, when they were sent away from your factory, could have been determined the same way, couldn't they ?

"*A.* Oh, hadn't any idea they were in that condition when they were sent out. We supposed we got goods up to the sample we bought.   *   *   *

" *Q.* In order to test corduroys, to find the defects, what would it be necessary to do ?

"*A.* The wearing quality of the corduroy, texture of it, can be told very easily by pulling it each way, with the weave and against it. Whether it is tender or not can be very easily told in that way. He would have to go over each pair separately, and each part of the pair, in order to ascertain that."

Witness testifies that from 30 yards of weave a dozen pairs of pants could be cut. In examining a piece of goods of that kind, they are thrown open and looked over. The sample piece that defendant buys from is simply sometimes a small piece of that size; other times it may be cut long enough to make a pair of pants, two yards and a half. Usually defendant opened the goods, that were sent but did not make a minute examination or investigation of the goods, and have them tested. Sample test is all right. Have to suppose it is in same condition. If there were black and white streaks across it, they would notice that, but not the wearing qualities of it at all. Do not examine goods as to tenderness at all.

The court instructed the jury correctly, as we think, "that by their letter of March 12, 1900, the plaintiffs

granted to the defendant the privilege to return any un-satisfactory goods, if in the same condition as they were when the plaintiffs delivered them," and further correctly instructed them "that the defendant could not arbitrarily determine that the goods were unsatisfactory and reject them or return them without some valid and sufficient reason, but that in order to authorize the defendant in rejecting or returning such goods it would be necessary for the defendant to satisfy you that there was some reasonable basis and ground for his action in returning such goods."

We think, however, that the court was in error in instructing the jury that there was any evidence before them from which they would be justified in finding that there was any reasonable basis for the defendant's action. Mr. Preston testified that "this sale was originally a sale by samples. The sale was originally by samples of goods. The samples came by express. Witness had then in mind at the time he gave the order of December 28th— the samples that Costuma sent them; that he examined them and knew what they were fairly well." Each subsequent order was given by reference to the number of these samples, and if the plaintiffs filled the order with goods which were up to the standard of the samples it was the legal duty of the defendant to be satisfied. *Schliess* v. *City of Grand Rapids*, 131 Mich. 52. "That which the law will say a contracting party ought in reason to be satisfied with, that the law will say he is satisfied with." *Duplex Safety Boiler Co.* v. *Garden*, 101 N. Y. 387.

Plaintiffs gave evidence tending to show that the particular goods returned were well up to the standard of the samples. Defendant never had even looked at them, knew nothing about them, and gave no evidence as to their quality whatever. The court permitted the jury to determine the quality of the goods returned entirely from the testimony as to other goods, charging them as follows in this regard:

"If you find that the defendant was having trouble with sales of goods manufactured from grades of corduroy fur-

nished by plaintiffs, and which grades were similar in number and quality to the grades returned to plaintiffs, and that such trouble with such sales to customers was occasioned by the tender and defective quality of such grades of corduroys and by such corduroys not being up to sample, or was occasioned because of the defendant's losing trade and customers without guaranteeing the quality of the manufactured articles, and that the quality of the cloth furnished by the plaintiffs was of that character that the defendant could not give such guaranty, then the defendant had valid reason for rejecting such corduroys and returning them to the plaintiffs, if such goods were in the same condition as when they were delivered, provided such goods were returned to the plaintiffs within a reasonable time."

There was no basis furnished by the evidence from which the jury could determine that the goods defendant had trouble with were *similar in quality* to the goods returned to plaintiffs. An agreement that goods sold shall prove satisfactory necessarily implies a reasonably prompt inspection where no period of time is specified, and if the vendee refuses the goods he must be prepared to show that the goods rejected were legally unsatisfactory. He cannot establish his right to refuse acceptance by showing merely that other goods received under similar orders were unsatisfactory. *McFadden* v. *George C. Wetherbee & Co.*, 63 Mich. 390.

We are also of opinion that the court erred in refusing to direct a verdict for plaintiffs as requested, for the reason that the defendant's act in ordering the goods back to Ionia constituted an acceptance in law. The defendant need not have shipped these goods to New York. It might have kept them at its place of business or stored them in Ionia, taking reasonable precautions to protect the goods. It saw fit, however, to ship the goods to plaintiffs and repudiated any interest in them. If defendant's claim that the goods were not in accordance with the contract was correct, then upon its refusal to accept them and return to plaintiffs, the goods belonged absolutely to the plaintiffs, and the reshipment of them by defendant would

constitute an unlawful conversion of them. Defendant, having taken its position, must adhere to it, and its dealing with the property in such manner as would be unlawful if it were the property of another constitutes an acceptance of the goods. *Farrington* v. *Smith*, 77 Mich. 550; *Foster* v. *Rowley*, 110 Mich. 63; *Cream City Glass Co.* v. *Friedlander*, 84 Wis. 53 (21 L. R. A. 135); Benjamin on Sales (6th Ed.), § 703; *Chapman* v. *Morton*, 11 M. & W. 534.

For the reasons given, the judgment is reversed, and new trial granted.

MOORE, C. J., and MCALVAY, OSTRANDER, and HOOKER, JJ., concurred.