HAKES *v.* THAYER.

1. FRAUD—BILLS AND NOTES—RESCISSION—WAIVER.

   The purchasers of a stallion, who signed joint promissory notes for the purchase price, on the representation of the seller's agent, and who, instead of rescinding the transaction after they had discovered the falsity of such representations, kept, used, and controlled the horse, thereby waived the right to avoid the transaction on the ground of fraud.

2. SAME—SALES.

   The purchaser of property who seeks to defend an action for the purchase price on the ground of fraud, must show that he rescinded the contract and refused to retain the subject matter thereof.

3. SAME—RESCISSION FOR FRAUD.

   And by keeping and using the horse, after they had attempted to rescind the contract for fraud and breach of warranty they waived the right of rescission.

4. BILLS AND NOTES—BONA FIDE HOLDER—BREACH OF WARRANTY AS DEFENSE.

   That the purchaser of promissory notes, given by several joint makers for a stallion, knew that the payee had warranted the horse, and that the notes were the consideration of the sale, but did not know the warranty was broken, having purchased them before the horse had shown any of the alleged defects, was insufficient to charge plaintiff with bad faith.

5. SAME.

   Failure of consideration, in whole or in part, after a bona fide transfer, does not affect the character of the indorsee, although he may have known the consideration for which the negotiable instrument was given.

6. SAME.

   Nor was such a transaction against public policy. (Distinguishing *People's Building & Loan Ass'n Co.* v. *Rutz,* 158 Mich. 440 [123 N. W. 6].)

7. SAME—NEGLIGENCE—BAD FAITH.

   The court erred in saying in his charge that if the plaintiff, from circumstances brought to his knowledge, as an ordinarily prudent man, had reason to believe that some defense

might be made to the notes that he held, he would not be a bona fide purchaser; since neither suspicions nor gross negligence constitute bad faith.

8. SAME.

It is not a ground of defense that the holder in due course was informed that the note was made in consideration of an executory contract, unless he was also informed of its breach.

Error to Kalkaska; Lamb, J. Submitted February 15, 1911. (Docket No. 167.) Decided May 8, 1911.

Assumpsit by Elisha H. Hakes against F. Thayer and nine others on three promissory notes. Judgment for defendants. Plaintiff brings error. Reversed.

*Louis E. Howlett   R. D. Roche,* of counsel), for appellant.

*Ernest C. Smith,* for appellees.

STONE, J. This is an action of assumpsit brought upon three promissory notes made by the defendants and others. The first one of said notes reads as follows:

600.00                     Kalkaska, Michigan, July 22, 1901.

On September 1, 1903, after date for value received I promise to pay Russell Iams or order six hundred dollars at the Kalkaska City Bank with interest at six per cent. per annum, interest payable annually.

| | |
|---|---|
| Tyler & Son. | H. V. Beaver. |
| J. A. Doherty. | George Priestly. |
| A. B. Doherty. | John G. Waltz. |
| F. Thayer. | A. J. Montgomery. |
| George W. Puffer. | J. D. Brown. |
| Paul Seitung. | George Seitung. |
| James A. Drake. | |

The other two notes were exactly the same as the above, except that they became due on September 1, 1904, and September 1, 1905, respectively.

The evidence is undisputed that the plaintiff purchased these notes of said Iams on September 30, 1901, and that he paid $1,665 for them in checks upon the Second National Bank of Toledo, Ohio, which checks were subse-

quently cashed by said Iams, and passed through the clearing house of Toledo. At the time of the purchase of these notes, they were each indorsed as follows:

" For value received I hereby guarantee the pay of the within note when due, and waive demand of notice and protest when due, and I agree to pay all costs and expenses in collecting the same.

"RUSSELL IAMS."

Whether or not the plaintiff was a bona fide purchaser and holder of these notes was a disputed question at the trial, and evidence was given at great length by plaintiff, tending to show that he was such bona fide holder, and detailing the circumstances under which he became the purchaser of these notes, as well as other notes which he, both before and after this transaction, purchased from said Iams.

The payee of these notes was a dealer in horses, and had been for some years engaged in buying and selling stallions. The notes in question were given for the purchase price of a stallion known as Gordon. The plaintiff, when he purchased these notes, knew that they were what might be termed " stallion notes," but he claimed and testified that he had no knowledge of the contract between Iams and the makers of the notes. Prior to the purchase of the notes in question, the plaintiff had purchased other sets of "stallion notes" from Mr. Iams, and he testified that up to the time of the purchase of the notes in question he had never had any trouble or litigation over any of the notes so purchased, and that at the time he purchased these notes he did not know of any defense that the defendants, or any of them, had to the notes, and that he purchased them in good faith, knowing that they were "stallion notes."

The defendants at the trial claimed that the notes were never delivered; that the execution of the notes was procured by fraud, and also that there was a warranty that the stallion for which the notes were given was a reasonably sure foal-getter, and that he was not. They offered

evidence, which is undisputed, to show that about July 1, 1901, a man by the name of Ritter, who claimed to be an agent of Russell Iams, was at the village of Kalkaska with a stallion by the name of Gordon, and solicited them to join with 18 men, who were to be good responsible men, in the purchase of this horse for $1,800, each paying the sum of $100 in three equal annual payments; that after Ritter had secured the promises of 18 such men a man by the name of May, who also claimed to be an agent of Iams, appeared at Kalkaska with the notes in question, and interviewed each maker at his home, and asked them to sign the notes. They claim that he stated to them that, unless 18 good, responsible men signed the notes, they were to be "no good," and that a meeting was to be held at Kalkaska village on the Saturday evening following, for the purpose of organizing the makers into an association to be known as the "Kalkaska County Horse Breeders' Association;" that at said meeting they were to determine whether or not the men whose signatures were upon the notes were acceptable, and, if not, to procure others that were; that, after obtaining the signatures to the notes as they now appear, both Ritter and May left Kalkaska with the notes, leaving the horse under the control of a groom.

It appears that the makers of the notes met on the Saturday evening following the signing of the notes, and at that time learned that Ritter and May had left town with the notes, and that they did not procure the 18 signatures of good responsible men as they had agreed to do, and did not organize them into an association, and that they had signed notes for $1,800, which might be bought by an innocent purchaser. After discovering the matter, they concluded to take the horse with a written guaranty, signed by Iams, and dated at Gibsonburg, Ohio, providing that, if the horse, Gordon, under proper care and treatment, should not prove to be a reasonably sure foal-getter, and they would return the horse to him, he would replace him with another horse of like kind and value, or

return the notes or refund the cash, and to pay the $1,800 for the horse. The signers of the notes on that evening organized themselves into the "Kalkaska County Horse Breeders' Association," electing a president, secretary, and treasurer, and a board of directors, and accepted the horse, all of which appears in evidence in the record. At a meeting held the following month, they hired a man to care for the horse, and they continued to own, operate, and control the horse until its death, which occurred in the year 1909. It appears that this association never owned any property, except this horse.

All of the defendants testified that at the time they signed the notes they knew that they were signing promissory notes for $1,800; that they could read, and that they knew that they were making themselves individually liable for that sum, but trusted the man May to procure the other signatures, and permitted him to take the notes with him. When they accepted the horse, they knew of the fraud of Iams' agent in getting the notes. The evidence on the part of the defendants tended to show that the horse was not as warranted, and was not satisfactory, and that, on December 11, 1902, the secretary of said association, under instructions, wrote the following letter to the said Iams:

"SOUTH BOARDMAN, MICH., December 11, 1902.
"Mr. R. IAMS, Gibsonburg, Ohio.

"*Dear Sir:* The Percheron stallion named Gordon, No. 26,650, that we bought of you a year ago last July proved to be no good as a foal-getter; of the mares served by your man while here in charge of the horse not one had a colt, and of the others served during the season only five had colts; this year is no better as far as we can learn. Of the folks that used the horse last year very few would use him this year; said they wanted a horse that would get colts. He has been a pretty expensive piece of property to us so far. Now we want you to give us back our notes or send us another horse that is all right.

"Yours respectfully,
"J. D. BROWN,
"Secretary, Kalkaska County Horse
Breeders' Association."

The reply to this letter was destroyed by fire. The witness stated the contents to be that Iams said in the letter that they didn't want another horse; that all the matter with the horse was that he was a masturbater; and that if they would put a proper shield on him he would be all right. The defendants claim that they tried the shield, but with no better or different result.

It is further claimed that in the fall of 1904 the defendants employed one William D. Totten to act in their behalf in said matter. Mr. Totten testified that he wrote a letter to Mr. Iams at his post-office address in Ohio. The answer to this letter was also shown to have been destroyed by a fire which occurred in Kalkaska. In answer to the question as to the contents of the letter, he said:

"According to the best of my recollection, I received a letter in which he declined to give any shipping instructions, and also refused to receive the stallion."

This answer was objected to as stating a conclusion, but the court permitted the answer to stand, to which plaintiff's counsel excepted.

The witness John L. Boyd testified along the same line as did Mr. Totten, and also to a conversation with Iams, whom he visited in 1907 in connection with the matter. There was also evidence on the part of the defendants tending to show that the plaintiff stated that, at the time he purchased the notes, he knew there was a contract back of these notes, or between the makers and Russell Iams, and knew that the contract guaranteed the horse to be a reasonably sure foal-getter with proper care and handling.

The plaintiff claimed that there was no evidence in the case of a rescission of the contract. At the close of the trial, plaintiff's counsel moved the court to strike from the record all the testimony tending to prove a fraud in the sale of the horse, for the reason that it fails to appear that these defendants ever rescinded, or attempted to rescind, the contract, and the defense of fraud could not be made by a party to a contract until he had rescinded the

same, which motion was denied, and to which counsel for plaintiff duly excepted. Counsel for plaintiff thereupon requested the court to charge and instruct the jury in part as follows:

"(2) It appears that after Ritter, May, and the groom had made certain false statements to the defendants which induced them to sign the notes in question, and after the defendants knew the representations, or some of them, were false, that they met and by concerted action accepted the horse, controlled him, and thereafter claimed to own him. Therefore I charge you that the defendants cannot now be heard to urge these false statements so made and within their knowledge at that time to defeat this action, and you should disregard them.

"(3) It appears that at the meeting held by these defendants when they determined to accept the horse, that Mr. Iams, as a part of the contract, warranted the horse to be a reasonably sure foal-getter, and that if he failed so to be, and the defendants would return the horse to him, he would replace him with a horse equally as good, or return the notes. It further appears from the evidence that the horse was not a reasonably sure foal-getter, but defendants did not return the horse. I therefore charge you that defendants cannot now urge that reason as a defense to this action, and you should disregard it.

" (4) I charge you that the defense of fraud to an action on a contract cannot be successfully made, unless the contract be rescinded promptly after discovery of the fraud, and the property returned.

" (5) I charge you that, in view of defendants' conduct in continuing to keep this horse after they found the statements and representations made to induce them to enter into this contract to be untrue, that in failing to return the property afterward, your verdict in this case must be for the plaintiff for the amount of his claim.

" (6) I charge you that any breach in the warranty that this horse should be a reasonably sure foal-getter cannot defeat the plaintiff's recovery, provided you find him to be a bona fide holder for value of this property."

All of said requests to charge were refused. The jury returned a verdict for the defendants, whereupon judgment was duly entered against the plaintiff of no cause of action, and for costs.

Plaintiff brings the case here by a writ of error, and the record contains 36 assignments of error. We shall only consider such as were discussed by appellant at the hearing, and in his brief.

1. It is the contention of plaintiff that the defendants, not only by express agreement among themselves, accepted the horse, but by their conduct had waived the right to make any complaint because of the fraud perpetrated upon them in the sale of the horse, or the execution of the notes. And by the twenty-seventh assignment of error plaintiff claims that the court erred in not giving his second request to charge. We are of opinion that the court was in error in refusing to give this request. This would apply to any fraud or false statements within the knowledge of the defendants at the time they accepted the horse. By the undisputed evidence, it appears that they then knew that the requisite number of signers had not been obtained, and that the company had not been formed. The defendants must certainly be treated as having waived any fraud in that connection, and they should not be permitted to urge it to defeat this action, and the plaintiff was entitled to have the jury instructed to disregard such fraud. *Craig* v. *Bradley,* 26 Mich. 353; *Wright* v. *Peet,* 36 Mich. 213; *John A. Roebling's Sons Co.* v. *Hematite Co.,* 70 Mich. 346 (38 N. W. 310); *Dailey* v. *King,* 79 Mich. 568 (44 N. W. 959); *Eames* v. *Manley,* 121 Mich. 300 (80 N. W. 15); *Smith* v. *Mc-Donald,* 139 Mich. 225 (102 N. W. 738); *Mestler* v. *Jeffries,* 145 Mich. 598 (108 N. W. 994).

2. It is urged by plaintiff that there was no rescission of this contract at any time; that the letter of the secretary, wherein he said, "Now we want you to send us back our notes or send us another horse," instead of amounting to a rescission, was a request to Iams to perform the contract in accordance with its terms; and that the defendants never returned the horse as provided in the contract; and that the same is also true of the efforts made by the witnesses Totten and Boyd.

This court has held, as a general proposition, that a person cannot claim that a contract has been annulled because of fraud, unless he rescinds and abrogates the contract. In other words, that a party could not claim to own the property purchased, and at the same time claim there was no sale. In *Rumsey* v. *Fox*, 158 Mich. 248 (122 N. W. 526), this doctrine was held:

"The purchasers of a stallion who received the property and who at no time attempted to rescind the contract, cannot question its validity on the ground of fraud, in an action on notes given for the purchase price."

And by the twenty-fifth assignment of error the plaintiff claims the court erred in refusing to grant his motion at the close of the testimony, and, by the thirty-sixth assignment of error, that the following language used by the court in its charge was erroneous:

"Now, as to the rescission of the contract, if you find from the evidence in the case bearing upon that proposition that the defendants did all that was required of them to carry out their contract in the rescission of this contract, then the contract can be said to have been rescinded, so far as they are concerned."

The defendants insist that they did all that was in their power to rescind this contract; that Iams refused to receive the horse or to make any provision for its shipment; and that defendants ought not to be required to assume the position of consignors of the horse, or to pay charges of shipment, and in support of their position they cite the following cases: *Osborn* v. *Rawson*, 47 Mich. 206 (10 N. W. 201); *Housding* v. *Solomon*, 127 Mich. 654 (87 N. W. 57); *Westinghouse Co.* v. *Gainor*, 130 Mich. 393 (90 N. W. 52); *Lyon* v. *Lindblad*, 145 Mich. 588 (108 N. W. 969); *J. I. Case Threshing Machine Co.* v. *Huber*, 160 Mich. 92 (125 N. W. 66). In the light of these authorities we might hesitate to say that the offer of the defendants to return the horse might not have operated as a rescission of the contract, had defendants' subsequent conduct been consistent therewith; but such was not the

case, and this brings us to the next point urged by the plaintiff.

3. We are of opinion that these defendants have waived the right to claim a rescission of this contract by continuing to keep and use the property. Upon this subject this court has spoken very clearly in the case of *Foster* v. *Rowley*, 110 Mich., at page 67 (67 N. W. 1079). In that case it was held that the use of chattels by a purchaser thereof for 30 days after he discovers the falsity of representation which induced the sale, constitutes a waiver of the right to rescind. In that case this court said:

"It was the duty of defendant, as soon as he learned of the misstatements, to rescind the contract; and notice of such rescission must have been promptly given, and adhered to, in order to bind the parties thereto. The continued use of the property for some 30 days after he had learned the facts would be a waiver of the right of rescission, even though notice of such rescission had been given. *Hubbardston Lumber Co.* v. *Bates*, 31 Mich. 158; *Dunks* v. *Fuller*, 32 Mich. 242; *Campau* v. *Lafferty*, 50 Mich. 114 (15 N. W. 40); *Craig* v. *Bradley*, 26 Mich. 353; *Gridley* v. *Tobacco Co.*, 71 Mich. 528 (39 N. W. 754); *Beal* v. *Congdon*, 75 Mich. 77 (42 N. W. 685); *Dailey* v. *King*, 79 Mich. 568 (44 N. W. 959). While the court left the question of rescission to the jury, we think, under the defendant's own testimony, the court should have instructed them to find a verdict for the plaintiff. We think defendant's continued use of the property for 30 days after he learned of the alleged fraud amounted to a waiver of any intent to rescind the contract. *Marthinson* v. *Insurance Co.*, 64 Mich. 384 (31 N. W. 291); *Cobbs* v. *Fire Association*, 68 Mich. 466 (36 N. W. 788); *Peninsular Stove Co.* v. *Osmun*, 73 Mich. 570 (41 N. W. 693)."

In *Kupfer* v. *Clothing Co.*, 141 Mich. 325 (104 N. W. 582), Justice BLAIR, in speaking for the court upon this subject, said:

"If defendant's claim that the goods were not in accordance with the contract was correct, then, upon its refusal to accept them and return to plaintiffs, the goods belonged

absolutely to the plaintiffs, and the reshipment of them by defendant would constitute an unlawful conversion of them. Defendant, having taken its position, must adhere to it, and its dealing with the property in such manner as would be unlawful, if it were the property of another, constitutes an acceptance of the goods. *Farrington* v. *Smith,* 77 Mich. 550 (43 N. W. 927); *Cream City Glass Co.* v. *Friedlander,* 84 Wis. 53 (54 N. W. 28, 21 L. R. A. 135, 36 Am. St. Rep. 895); Benjamin on Sales (6th Ed.), § 703; *Chapman* v. *Morton,* 11 M. & W. 534."

These defendants could not play fast and loose in this matter. Their keeping the horse and using it and treating it as their own for years, until it finally died in their possession, is wholly inconsistent with their claim that they relied upon a rescission or abrogation of the contract. Upon this point the cases cited by defendants' counsel can be readily distinguished from this case. We think that the plaintiff's thirtieth assignment of error, in which he complains because the court refused to give his fifth request, is well founded.

4. So far we have treated this case as though the plaintiff occupied no better position than the payee of the notes. The plaintiff gave evidence tending to show that he was a bona fide holder of the notes, and that question should have been properly submitted. There was some evidence in the case that at the time the plaintiff purchased them he knew that they were "stallion notes," and that Iams sold the horse with such a warranty as was given. There is no evidence that at the time the plaintiff purchased these notes—which was a few months after they were made—there had been any breach of the warranty, and certainly no evidence that the plaintiff had any knowledge of a breach of the warranty.

By the thirty-fifth assignment of error, complaint is made of the following instruction, relating to the notes, by the court:

"If you find that these notes were procured by Russell Iams by fraud, or that there was a contract back of such notes, and that that contract had not been fulfilled by the

payee, and that the plaintiff at the time he became the purchaser of these notes had notice or knowledge of such fraud or such contract, then the plaintiff cannot be considered a purchaser in good faith, and he cannot recover in this case."

We think that this instruction was clearly erroneous. *Miller* v. *Ottaway*, 81 Mich. 196 (45 N. W. 665, 8 L. R. A. 428, 21 Am. St. Rep. 513); *Bottomley* v. *Goldsmith*, 36 Mich. 27; 7 Cyc. pp. 947, 948.

There is no evidence of any breach of the contract subsequent to the sale of the horse, and taking possession thereof by the defendants, before the purchase of these notes by the plaintiff on September 30, 1901. A failure of the consideration in whole or in part after a bona fide transfer does not affect the character of the purchaser, although he had full knowledge of the original consideration for which the note was given. There is no evidence of notice, or knowledge of the breach of this contract, in so far as the failure of the horse to comply with the warranty is concerned, before the transfer of these notes. The purchaser of notes may have knowledge of a collateral agreement, but is not obliged to inquire whether the seller has performed his agreement, or will be able to perform the agreement into which he has entered. The contract of warranty in this case was a lawful contract, not fraudulent or against public policy. In this connection we may as well say that the *Bohemian Oats Cases*, cited by defendants' counsel, have no application here. Knowledge of those contracts, or bonds, was knowledge of fraud, and of contracts made in violation of law and against public policy. Not so with this warranty. Upon this branch of the case counsel for defendants has also cited the recent case of *People's Building & Loan Association Co.* v. *Rutz*, 158 Mich. 440 (123 N. W. 6). In that case the circuit judge had charged substantially as the trial judge did in this case. Verdict went for the plaintiff; the defendant appealed, and this court simply said:

"The limitation placed upon the plaintiff's *bona fides*

was certainly as favorable to the defendant as could be expected."

This is very far from approving the correctness of the charge. This brings us to the next proposition.

5. Was there error in the charge of the court as to what would constitute bad faith? Upon this branch of the case, the thirty-third assignment of error alleges that the court erred in instructing the jury as follows:

"If you believe from the evidence that the plaintiff, before he purchased said notes, knew, or as an ordinarily prudent man had reason to believe, from circumstances brought to his knowledge before he purchased them, that the defendants had or claimed to have a defense to said notes, or to some portion of them, then the plaintiff is not an innocent purchaser of said notes, and would not be entitled to recover."

We think that there was error in this portion of the charge. It was at one time held that circumstances which ought to excite the suspicions of a prudent and careful man constituted notice and put the purchaser upon inquiry. This rule has been abandoned, and it is the almost universal rule now that neither suspicions, nor even gross negligence on the part of a taker will affect his right, unless the suspicions or circumstances amount to bad faith. Suspicions or even knowledge of facts which will fall short of bad faith do not amount to notice. *Davis* v. *Seeley*, 71 Mich. 209 (38 N. W. 901); *Helms* v. *Douglass*, 81 Mich. 442 (45 N. W. 1009); *Detroit Nat. Bank* v. *Union Trust Co.*, 145 Mich. 656 (108 N. W. 1092, 116 Am. St. Rep. 319); *Custard* v. *Hodges*, 155 Mich. 361 (119 N. W. 583); *Armstrong* v. *Stearns*, 156 Mich. 597 (121 N. W. 312); 7 Cyc. p. 945. We think, therefore, that the court erred in saying to the jury that if the plaintiff, from circumstances brought to his knowledge, as an ordinarily prudent man, had reason to believe that some defense might be made to the notes, that he was not a bona fide purchaser. At most, such knowledge

would put him upon inquiry for further information, and would not itself be evidence of bad faith.

These authorities are so recent and so well known that we refrain from quoting from them, and will only add that the correct doctrine appears to be that it is not a good ground of defense against a bona fide holder for value that he was informed that the note was made in consideration of an executory contract, unless he was also informed of its breach. If he had knowledge of the breach, the defense may be interposed. The question is now one of good or bad faith. Circumstances of suspicion, or even gross negligence, are merely admissible as evidence tending to show *mala fides*, but do not of themselves preclude the holder from recovery.

Some complaint is made by the assignments of error of rulings of the court upon the admissibility of evidence. We have examined them, and are of opinion that these questions will not likely arise upon a new trial.

For the errors pointed out, the judgment below must be reversed, and a new trial granted.

MOORE, McALVAY, BROOKE, and BLAIR, JJ., concurred.