BAYER v. WINTON MOTOR CAR CO.

1. SALES—CONTRACTS—WRITTEN CONTRACT—ESSENTIALS.

  A written order for a secondhand automobile, signed by plaintiff, identifying the machine, stating price, terms, time and place of delivery, accompanied by partial payment, and accepted in writing, contained the essentials of a contract, and was an agreement in writing between the parties for the purchase and sale of the automobile referred to.

2. SAME—WARRANTY—EXPRESS WARRANTY—EVIDENCE—PAROL TESTIMONY.

  Where a written agreement contained no language of express warranty, no express warranty could be proved by parol.

3. SAME—IMPLIED WARRANTY—CAVEAT EMPTOR—SECONDHAND MACHINERY.

  The principle of an implied warranty, an exception to the general rule of *caveat emptor*, does not apply to the purchase of secondhand machinery.

4. SAME—FRAUD—TOTAL FAILURE OF CONSIDERATION—RESCISSION.

  Where plaintiff charged in his declaration, and claimed in his testimony, that he was induced to purchase this automobile both under an oral warranty and by false representations intended to "cheat, wrong and defraud" him, so that there was a total failure of consideration, entitling him to reimbursement of the purchase price and expenditures reasonably made while trying to use the machine for the purpose for which it was intended, avoidance of the contract involves the question of rescission.

5. SAME—REASONABLE TIME—RESCISSION.

  While entitled to a reasonable time to investigate and ascertain whether the representations upon which he relied are true, to entitle plaintiff to rescind and recover back the money he was fraudulently induced to pay, he must act promptly after he has discovered that the representations were false.

6. SAME—REASONABLE TIME—RESCISSION—QUESTION OF LAW.

  Where the facts are undisputed, what is a reasonable time in which to rescind becomes a question of law.

7. SAME—RESCISSION—REASONABLE TIME—EVIDENCE.

>   Plaintiff's own evidence showing that long after he had
>   learned by actual use and personal observation and also
>   from information furnished him by competent and ex-
>   perienced men in his employ that the car was worn out
>   and worthless, he elected to treat the car as his own and
>   attempted to sell it for $600 or $700, although he now
>   claims it was valueless, negatived a rescission, and a
>   verdict should have been directed for defendant.

Error to Wayne; Van Zile, J. Submitted June 26, 1916. (Docket No. 135.) Decided December 22, 1916.

Assumpsit by Joseph Bayer against the Winton Motor Car Company for breach of a contract of warranty for the sale of an automobile. Judgment for plaintiff. Defendant brings error. Reversed, and no new trial ordered.

*Millis, Griffin, Seely & Streeter,* for appellant.
*Benjamin S. Pagel,* for appellee.

STEERE, J. In July, 1911, plaintiff purchased from defendant for the sum of $1,100 one of its 1908 model automobiles, first sold by it when new for $4,500 to a customer who used it until 1911, when it was taken back by defendant in an exchange allowance upon the purchase price of a new model of similar type.

In this action, begun November 2, 1914, plaintiff recovered a verdict and judgment against defendant of over $1.800, being for moneys claimed to have been expended by him, without any value received, for the purchase price of this car and expenses incurred in connection with it.

Negotiations for the car resulted in a written memorandum of agreement signed by plaintiff and a salesman of defendant, in the form of an accepted order evidently made upon one of defendant's blank forms for sales, various inapplicable portions of which were not filled out. So far as material here it is as follows:

"Memorandum of Order to

"THE WINTON MOTOR CAR CO.,

"Cleveland, U. S. A.

"You are hereby authorized to deliver to me 16-6 No. 7564 48.6 H. P. Winton six cylinder Automobile, with regular equipment * * * for which I agree to pay $1,100 plus the cost of extras and freight charges. I * * * hand you herewith $100, balance payable upon delivery. I * * * desire the following extras: * * *

"Fix back curtain.

" "  " of body.

"Overhaul car.

"Put on speedometer.

" "  " big steering wheel. * * *

"Delivery on or about August 4th. * * *

"Signature of purchaser, JOSEPH T. BAYER.

"Address of purchaser, 469 St. Aubin.

"Salesroom at Detroit. Date, July 20.

"Signature of Salesman, ROBERT WHEAT."

It is undisputed that the automobile, No. 7564, was of the kind and size described in the written memorandum of agreement, was a 1908 model sold that year to a customer residing in Detroit who kept and drove it extensively until it was taken back by defendant in exchange for a new one in 1911; that plaintiff looked at it in defendant's salesroom, or garage, in Detroit, shortly after it had been returned and purchased it as a secondhand car for less than a quarter of its original cost when new.

Plaintiff first saw the car in its condition when returned, before it had been cleaned or overhauled, and then made the contract of purchase, paying upon it the $100 specified. After it was overhauled and painted he again saw and was taken riding in it. He states:

"After the Winton people had given me a chauffeur, and tried the car out, it was delivered to me, and I paid for it."

This chauffeur was in defendant's employ and only drove the car for plaintiff in trying it out before it

was delivered. After its delivery plaintiff, who did not himself drive a car and asserted upon the trial, "I don't know the first thing about a car," employed a chauffeur named Brealler, whom plaintiff testified was an experienced man and "understands all about the machine." Of his experiences and expenses with the car from that time on plaintiff and his witnesses tell a distressing story, from which the asserted deductions are that the car was old, worn-out, and worthless, so defective as to be past hope of restoration, and of no value to use as an automobile, for which purpose it was sold, and, it is claimed, there was a total failure of consideration.

Upon that proposition defendant claimed, and introduced testimony tending to show, that the car while in the hands of the original purchaser, though regularly in use, was well kept up and cared for, and driven by an experienced chauffeur who ran it from the time it was purchased until exchanged for a new one; that he had driven it for the previous owner on long touring trips without unusual trouble or breakdowns, and it continued in efficient running order and good condition until he took it to defendant when the exchange for a new one was made; that when plaintiff sent it to defendant's garage for repairs after its purchase by him its condition showed that it had been misused, not properly cared for or operated, and was a "neglected car."

If controlling, the condition of the car when plaintiff received it would be a question of fact for the jury, but it was purchased as a secondhand car under a written contract containing no terms of warranty. It is said in his counsel's brief that:

"The case is not based on 'a breach of warranty of a contract in writing,' * * * but is planted upon a total failure of consideration."

194—Mich.—15.

His pleading and proofs appear to have taken a wider scope. The various counts of his declaration charge, in part, that defendant represented to and promised plaintiff that the car was properly constructed, or reconstructed, and assembled in first-class mechanical condition throughout, capable of performing and would successfully perform the work for which it was designed in a manner satisfactory to plaintiff, and could be used in driving about the town and country, relying upon which plaintiff purchased the car, but that it was in fact "improperly constructed and assembled in such a wornout mechanical condition in all its parts as to be totally unfit for the work for which it was designed, or for any use as an automobile for pleasure or profit," and he was by defendant's false and fraudulent representations, upon which he relied, induced to make the purchase.

In substantiation of these allegations plaintiff was allowed, against objection, to testify to his own inexperience and inability to judge a car, his reasons for buying one, the use he desired to make of it, what he told defendant's salesman in that particular, the representations made by defendant's agents to him as to the quality and condition of this car and, in general, to give his version of the negotiations and representations which preceded and led up to the purchase evidenced by the written memorandum of agreement.

Plaintiff's testimony discloses that he was engaged in the coach and livery business, and for use in that connection as well as for family purposes he decided to buy a used car, and with that object in view went to defendant's establishment on the recommendation of a friend named Huck, who was in the saloon business and owned a Winton of the same model as the one purchased. On his first visit defendant had no secondhand car in stock, but informed him that "there was going to be an old car turned in for a new one

in a few days and you can look at it." In a few days plaintiff returned to look at the car, accompanied by his friend Huck, whom he states he took along "to look over the car with me." Of Huck's participation in the deal plaintiff further testified on cross-examination:

"He told me to take the car. He said it was cheap, to take it, just like mine, he says, that is all. * * * Mr. Huck is a personal friend of mine. I had a good deal of confidence in him.

"*Q.* On a business proposition you took his word on the advisability of going in it or staying out?

"*A.* In that one—I didn't know the first thing about the machine, I told you before. I told the Winton company that is the reason I left it to Mr. Huck, because he had owned one of the same kind."

He also states, however, in reference to this, that he did not buy the car on Huck's recommendation, but on the strength of defendant's promise to put it in first-class condition.

While defendant's objections to evidence as to oral assurances in negotiations leading up to the written memorandum of agreement were overruled, the view was expressed by the court early in the trial that the applicable rule of law controlling the case was:

"Where a person buys a piece of property manufactured for a particular purpose, and the manufacturer sells it understanding it is to be used for a particular purpose, that he must deliver property that is fit for the purpose"

—later saying to defendant's counsel, when objection was made to questions asked in cross-examination. claimed to have a bearing on his direct testimony as to an express warranty, that the case was to be tried upon the question:

"Was that machine fit for the purpose? * * * It does not matter how it is termed—on the terms of implied or express warranty. Was this machine fit

for the purpose for which this man bought it? If it is not, he can recover. If it is, he cannot."

The claim of total failure of consideration necessarily goes with and relates to the claim of implied warranty that the article was reasonably fit and adapted to the purpose for which it was purchased—which was to use as an automobile. Plaintiff's claim and testimony were directed and limited to that question. The machine was not shown to be commercially valueless in all its parts, for any purpose.

Upon the trial it was defendant's theory and contention that there could be no implied warranty as to fitness for the purpose the buyer intends when the article purchased is a secondhand machine, and in any event plaintiff was precluded from recovery by failure to rescind within a reasonable time after trying the car and ascertaining its claimed defects. These legal questions were timely raised and preserved for review by objections, exceptions, motion for directed verdict, and requests to charge, which were overruled and denied.

In submitting the case to the jury the court charged, in part, as follows:

"It is undisputed that the plaintiff told defendant's agent that he was totally unfamiliar with automobiles and their construction and he had a right to rely on the representation of the defendant's agents concerning the condition and value of the machine as an automobile for the purpose for which the plaintiff said that he desired to use it. * * * Should you then find in this case that the automobile delivered by plaintiff (defendant) to the defendant (plaintiff) was old and worn-out, so much so as to be of no value to the plaintiff, then I charge you that there was a total failure of consideration in the case, and the plaintiff would be entitled to recover back the amount of $1,100, which he paid for the car, together with the various amounts which he spent in an effort to make the automobile operate, * * * together with interest from

the time it was paid out, at 5 per cent. per annum; that of course is upon the theory that the automobile was of no value.   *   *   *   In this case the matter of implied warranty obtains, and the implied warranty is that they will sell the property that is asked for, and desired by the purchaser, and if that property is worthless, then the purchaser may recover the value of the consideration—whatever damage it may be to him."

It cannot be questioned that the written order signed by plaintiff, identifying the property, stating price, terms, time, and place of delivery, accompanied by partial payment and accepted in writing, contained the essentials of a contract and was an agreement in writing between the parties for the purchase and sale of the automobile referred to. *Day Leather Co.* v. *Michigan Leather Co.,* 141 Mich. 533 (104 N. W. 797). It contains no language of express warranty. Words of description only are used. Where a written agreement is silent upon the subject of warranty no express warranty can be proven by parol. *McCray Refrigerator, etc., Co.* v. *Woods,* 99 Mich. 269 (58 N. W. 320, 41 Am. St. Rep. 599). The instruction to the jury that plaintiff had a right to rely on the representations of defendant's agents concerning the condition and value of the machine as an automobile for the purpose for which plaintiff said he desired to use it, indicated that the jury might consider and find from the proof an express oral warranty. This was followed by the statement that in this case the matter, or question, of an implied warranty obtains, defining the principle of an implied warranty, an exception to the general rule of *caveat emptor,* which by the weight of authority does not apply to the purchase of secondhand machinery. 2 Mechem on Sales, § 1348; 35 Cyc. p. 408; Williston on Sales, § 232, and note to *Fairbanks Steam Shovel Co.* v. *Holt & Jeffery,* in L. R. A. 1915B, 477 (79 Wash. 361, 140 Pac. 394).

Plaintiff charged in his declaration and claimed in his testimony that he was induced to purchase this machine both under an oral warranty and by false representations intended to "cheat, wrong, and defraud" him.

As pointed out, the claim of total failure of consideration is based under the developed facts upon a breach of implied warranty of secondhand machinery, but it is also contended by plaintiff that fraud was charged and proven in this case, perpetrated both by false assurances and concealment of latent defects, as a result of which plaintiff received nothing of value to him and was defrauded out of the purchase price, entitling him to reimbursement of the same and expenditures reasonably made while trying to use the article for the purpose intended. Avoidance of the contract under such contention involves the question of rescission. While entitled to a reasonable time to investigate and ascertain whether the representations upon which he relied are true, to entitle a party to rescind and recover back the money he was fraudulently induced to pay, he must act promptly after he has discovered that the representations were false; and where the facts are undisputed, what is a reasonable time in which to act becomes a question of law. Upon that proposition plaintiff's own evidence as to what he discovered, and when, calls for serious consideration. He states that right after the car was delivered to him, in August, 1911, he took a ride in it and "she would not work"; that "trouble began to start" within half a mile of his home, and he notified defendant, who had it taken down and looked over, and they said it was all right; that soon thereafter, during September, 1911, accompanied by members of his family, with Brealler as chauffeur, he took a trip in the car to Dayton, Ohio, about 200 miles distant from Detroit, returning in it to Monroe, Mich., from where, owing to

recurring trouble with the car, they completed the journey home by rail. As told by him, he had trouble with the car from the time it was delivered to him, discovered before he began this trip that the tires were so old, worn out, and rotten that he had to throw them away and buy new ones before beginning the journey; that the car went wrong, refused to run for a time, and caused delay before they were scarcely 20 miles on their way, and they "had trouble with the machine in pretty near every town on the road. It did not work all the way going down." His account in detail of the trouble had with, and various defects which developed in, the car during that journey, necessitating repeated expenditures for repairs and new parts, with resulting annoyance, delay, and discomfort, taken as true, is strongly convincing that he had by experience and expense become fully advised of the condition of the car and defects now complained of by the time that journey was over and within scarcely a month of the time the car was delivered to him. At plaintiff's request defendant sent a man to Monroe for the car, who found the trouble was with the ignition, which he remedied, when he and Brealler drove it to Detroit. The car was put up for the winter in plaintiff's barn by Brealler, and plaintiff took it out again in the spring of 1912, first having it overhauled by a machinist whom his brother recommended. He states that he observed this man at work on it in the barn from time to time, saw what he was doing, and was told by him in the first place:

"You cannot do nothing with this car; it is hoodoo. A lemon. Everything on that car is a ruin. It is gone to pieces. You ought to have a whole new engine."

But that summer he turned the car over to a chauffeur named Jewett to work on commission as a taxicab, who had it for that purpose "between June and September." Jewett testified that when he first took

it out it would not run, and that he spent much time working on it and lost money while operating it, owing to its getting out of order and breaking down so that he finally "gave it up as a bad job." In the fall plaintiff again had the car put in his barn for the winter. Up to that time he frequently had work done upon the car by, and procured parts and supplies for it from, defendant for which bills were rendered to and paid by him. Some time during the next winter, in 1913, he had the car taken to defendant's garage to be overhauled and repaired. He states that he went down there himself and told the foreman, "I wanted the car fixed up so we could sell it." He also testified that while there he talked with Mr. Rhead (who was assistant to the manager) about it and told him:

"I am going to sell it, whatever we get. He says, 'How much do you want out of the car?' and I says, 'Six or seven hundred dollars; sell it; as long as I get a couple of hundred out to pay these bills, I don't care about it.' He didn't get anybody; I guess he didn't show anybody the car there after that. They called me up one day and told me that I would have to pay storage on that car. I left the car with instructions to them to fix it up, so that they could sell it for me; that is the way it was told to them."

Subsequently a bill was rendered to him for these last repairs, and storage of the car thereafter, which he declined to pay, and when collection was pressed this action was begun.

In *Foster* v. *Rowley*, 110 Mich. 63 (67 N. W. 1077), it is said:

"It was the duty of defendant, as soon as he learned of the misstatements, to rescind the contract; and notice of such rescission must have been promptly given, and adhered to, in order to bind the parties thereto. The continued use of the property for some 30 days after he had learned the facts would be a waiver of the right of rescission, even though notice of such re-

scission had been given. *Hubbardston Lumber Co.* v. *Bates,* 31 Mich. 158; *Dunks* v. *Fuller,* 32 Mich. 242; *Campau* v. *Lafferty,* 50 Mich. 114 (15 N. W. 40); *Craig* v. *Bradley,* 26 Mich. 353; *Gridley* v. *Tobacco Co.,* 71 Mich. 528 (39 N. W. 754); *Beal* v. *Congdon,* 75 Mich. 77 (42 N. W. 685); *Dailey* v. *King,* 79 Mich. 568 (44 N. W. 959). * * * We think defendant's continued use of the property for 30 days after he learned of the alleged fraud amounted to a waiver of any intent to rescind the contract. *Marthinson* v. *Insurance Co.,* 64 Mich. 384 (31 N. W. 291); *Cobbs* v. *Fire Ass'n,* 68 Mich. 466 (36 N. W. 788); *Peninsular Stove Co.* v. *Osmun,* 73 Mich. 570 (41 N. W. 693)."

Under any aspect of the case this sale was not void, because forbidden by law, but only voidable at plaintiff's option, provided he acted consistently and promptly in so asserting upon discovering that he had been defrauded. His own evidence negatives this. He shows that long after he had learned by actual use and personal observation, and also from information furnished him by competent and experienced men in his employ, that the car was worn-out and worthless, "a ruin," and "gone to pieces," as he states, he elected to treat the property as his own, declared in the last proven interview with defendant in relation to it that he was going to sell it, directed that it be fixed up so that they could sell it for him and named a selling price of $600 or $700, for what he now contends was valueless. Under his own testimony a verdict should have been directed for defendant.

For the foregoing reasons, the judgment is reversed, without a new trial.

STONE, C. J., and KUHN, OSTRANDER, BIRD, MOORE, BROOKE, and PERSON, JJ., concurred.