FLANIGAN *v.* BYERS.

CANCELLATION OF INSTRUMENTS—CONTRACTS—MORTGAGES.

In a suit to set aside a certain written contract and mortgage, the finding of the trial judge that the contract was superseded by a subsequent oral contract, and that the mortgage was executed by plaintiff, who could neither read nor write, without understanding the nature of the instrument and on defendant's promise that if it did not conform to plaintiff's understanding of the agreement, it should be made satisfactory to him later, *held*, justified by the record.

Appeal from Iron; Driscoll (George O.), J., presiding. Submitted October 4, 1923. (Docket No. 35.) Decided November 13, 1923.

Bill by John Flanigan against Isaac W. Byers and others to set aside a contract and mortgage. Defendants filed a cross-bill for the foreclosure of said mortgage and an accounting. From a decree for plaintiff, defendants appeal. Affirmed.

*Daniel J. O'Hara,* for plaintiff.

*L. A. Lyon,* for defendants.

CLARK, J. The bill was filed to set aside a contract and a mortgage, to remove cloud from title, and for general relief. There was answer and a cross-bill, praying an accounting, the foreclosure of the mortgage, and other relief. The decree set aside the contract and the mortgage and made an accounting between the parties. Defendants have appealed. The question is whether the decree under the facts is equitable.

The question as to implied warranty of fitness of property bought for special purpose is discussed in notes in 22 L. R. A. 187; 15 L. R. A. (N. S.) 868; 31 L. R. A. (N. S.) 783; 34 L. R. A. (N. S.) 737.

The parties were residents of Iron county.   For the purposes of the case, defendants, Byers, Konwinski, Van Ornum and Waeber, may be said to have owned, on December 7, 1920, and for some time prior thereto, 1,258 sheep.   The sheep were in possession of Smith & Vaile in Wisconsin.   Plaintiff, as defendants knew, owned land in Iron county, but did not have feed for the sheep and necessary shelter and equipment, particularly if lambing was to occur during the winter months.   Defendants owned equipment. Plaintiff had not seen the sheep since June, 1920. Continued negotiation between the parties resulted in a contract, Exhibit A, signed on December 7, 1920, from which we quote:

"Parties of the first part own 1,258 sheep—ewes and bucks and agree to deliver them to said party of the second part at his Wisconsin farm by Smith & Vaile within the next five days.

"The said party of the second part agrees to receive said sheep and feed them and treat and take care of them with proper care and diligence until the first day of October, A. D. 1921.   That on or before the first day of October, A. D. 1921, he will pay the said parties of the first part $4,000 out of the sale of lambs from said ewes.

"That upon the execution of collateral security on real estate in Stambaugh township, section 23-42-35 the first parties will furnish money for buying feed for said sheep during the winter of 1920 and 1921.

"That at the termination of this agreement the said second party will deliver to the parties of the first part 1,258 sheep—ewes and bucks either the same ewes and bucks or others of the same relative age to make up that number wherever the parties may agree in Stambaugh township.

"The said party of the second part shall have the use of sheep wagons, shearing machines and all equipment going with and belonging with said flock of sheep as long as he keeps them.

"The said party of the second part agrees to execute a mortgage on real estate in section 23-42-35 in Stam-

baugh township upon execution of this agreement guaranteeing the faithful performance of this agreement and securing the furnishing of said moneys for the feed of said sheep."

Later, plaintiff and Van Ornum went to the farm of Smith & Vaile for the purpose of counting and making delivery of the sheep and equipment. We quote from the opinion of the trial judge:

"It is asserted by plaintiff and denied by defendants that before executing Exhibit A, defendants guaranteed that the sheep to be delivered under the contract should be in good physical condition, well fed, and free from disease; that the bucks had not been with the ewes and that there would be no premature lambing and that, relying on this, plaintiff signed the contract.

"It is undisputed that Smith & Vaile were present when Exhibit A was signed and that they told plaintiff, in defendants' presence, before the contract was signed, that the bucks had not been with the ewes. I am satisfied that there had been a number of bucks in with the ewes at and for a considerable time before that time; that a number of the sheep were afflicted with 'big-neck' or goitre and quite a number of them were afflicted with the 'sniffles' and with 'stomach worms.'

"On December 11, 1920, plaintiff was told by Smith & Vaile that they, Smith & Vaile, had turned the bucks in with the ewes in this flock. On that day he traded some cattle with Smith & Vaile for a herd of some 290 sheep. Later on the same day, he saw Mr. Van Ornum and told him that 'If they have turned that bunch of rubbish in with them, it has spoiled my deal; I don't see no use of my going out there.' Defendant Van Ornum said 'Let's go out and see what there is.' Plaintiff having purchased sheep from Smith & Vaile, had to go out there anyway. On December 12, 1920, he and Mr. Van Ornum went to Smith & Vaile's. The sheep had been until the night previous some 10 miles away in charge of a herder; but when plaintiff and Mr. Van Ornum arrived there they were enclosed in a yard at Smith & Vaile's farm. It is undisputed that on the night of December 11,

1920 (when the sheep were brought to the Smith & Vaile farm), the bucks and ewes were intermingled.

"After Mr. Van Ornum and plaintiff arrived at the farm an attempt was made to count the herd. What happened as a result thereof is in dispute. Plaintiff alleges and testified, in substance, that the count showed the sheep about 100 short in number; that the sheep were staggering about the yard; that they were poor, dirty and sniffly—as poor a bunch of sheep as he ever looked at; that he told Van Ornum that they were not like he said they were; that the bucks had been with them and they were dying with hunger and that he could not take them; and that they 'started for home and left it that way;' that it was thereafter (on the same evening) verbally agreed between him and Mr. Van Ornum that he, the plaintiff, should take the sheep; that defendants should furnish the money to provide feed for them, build sheds and pay the help; and that when the lambs were sold they would pay him for his services in taking care of them; that they (plaintiff and Van Ornum) went back next day, December 12th, and he took the sheep to his place; that on the 14th he went to see Mr. Byers and was informed by Byers, that he, Byers, had talked with Van Ornum about the sheep and about getting feed for them and that they would help him with money if he had to fix sheds and get feed; that Byers told him they had also talked about a contract and had the paper ready; that they then went to the bank to sign the paper; that when Mr. Byers started reading it he, plaintiff, demurred on the ground that it did not correspond to the agreement made between him and Mr. Van Ornum, whereupon Mr. Byers said, 'You sign this paper. If this paper ain't what you and Mr. Van Ornum agreed on, as soon as we get those panels and count those sheep we will make the paper satisfactory to you, whatever you and Mr. Van Ornum agreed upon;' that he, the plaintiff, answered that he would 'take a chance on him' and signed the paper; that he didn't know a thing in particular that was in the paper and took Mr. Byers' word that they would use them right on the sheep; that he thought he was signing a 'temporary contract until they got the panels to his place to count the sheep' when he thought they would make a new paper, agreeing to furnish him

money to buy food and pay help and to pay him for his services when he was through with the sheep. The paper which plaintiff signed is Exhibit B, the mortgage in question here.

"The defendants, on the other hand claim and gave testimony to the effect that the plaintiff accepted the herd and executed Exhibit B under and pursuant to the terms and provisions of Exhibit A; that no subsequent verbal contract was ever made; that both Exhibit A and Exhibit B are in full force and effect; that plaintiff is indebted to them in a large sum of money which is secured by Exhibit B; and that they are entitled to an accounting and a foreclosure of Exhibit B.

"None of the defendants saw these sheep from the time plaintiff got them until the following spring or summer. Plaintiff got feed for them and fed and took care of them. He fixed a large shed for them. The sheep were very poor and many of them had been gotten with lamb before he got them. They started lambing about February 1, and quit in July, 1921. Defendants did not furnish him money to buy feed but indorsed his notes given for feed and he spent some of his own money for feed. After plaintiff got the herd in question here into pretty good shape, he tried to purchase them of defendants. He first offered $8,000 for the herd. Later he offered as high as $11,000. He continued to try to purchase them until about October 1, 1921. On that day he returned to defendants the herd in question together with the lambs issuing therefrom.

"Plaintiff claims Exhibits A and B never became effective and that he handled the sheep under a verbal arrangement or contract, and not under the terms of Exhibit A, while defendants claim that Exhibits A and B have always been in effect and were never superseded or supplemented by any verbal agreement. The main question of fact herein is, therefore, whether or not the verbal contract or arrangement which plaintiff claims was made was in fact made. Whether or not it was made lies chiefly within the knowledge of Mr. Flanigan and Mr. Van Ornum, and as they disagree about it the surrounding facts and circumstances must be considered.

"Plaintiff cannot read or write, though he has

learned to sign his name after a manner. He, Van Ornum and Byers have long been well acquainted and frequently associated in business. Mr. Van Ornum up to a few years ago was principally engaged as a real estate dealer and in lumbering operations but is now in the banking business. Mr. Byers has practiced law for 20 years but is now most actively engaged in other business. He has been Mr. Flanigan's legal adviser on many occasions. Plaintiff's chief occupation is farming and lumbering but he has had considerable experience in the sheep business and is apparently considered by Mr. Byers and Mr. Van Ornum as a shrewd man and a money maker. If defendants' version of this transaction is true, plaintiff, although a very shrewd man who always argued about 'everything' executed Exhibit A without any understanding or agreement that it should not be effective until he accepted the sheep, and accepted the sheep after he knew the bucks had prematurely been with the ewes and when he figured them to be at least 70 short in number, and, according to Mr. Van Ornum, was 'perfectly satisfied with the count' and 'thought he had the finest deal that ever was made.' That there was in fact a shortage when the count was made cannot be doubted after a careful examination of the entire record. Originally there was but 1,258 sheep. Some of these died on the range. Twenty-two remained after the herd to be turned over to plaintiff, were counted out. These are the 22 that Smith & Vaile later put into the herd traded by them to plaintiff. Van Ornum does not claim that the count was accurate. He admits that when the count was made plaintiff threw up his hands and said the count was 'no good' and that it was 70 short. He also testified that Smith turned the sheep out thinking that plaintiff would not take them. Howland understood that plaintiff was not satisfied, and that there would be another count the following morning but says that when plaintiff came back next morning he seemed satisfied and took the sheep 'without asking for a count or anything.' These facts and circumstances (and many others which might be mentioned if space permitted) strongly support plaintiff's claim and testimony that a new agreement had been made in the meantime and that he took the herd under such new

agreement and not under Exhibit A.     That plaintiff would be 'satisfied' the next morning without some such thing having meanwhile occurred seems very improbable, especially when we also consider the fact that he was wholly unequipped and unprepared to handle any such herd as this if the lambing began prematurely and the poor condition of the herd at the time he took it over.     The fact that he afterwards repeatedly asked defendants to deliver the sheep panels to make the count of the sheep, that he sold his own lambs but kept the lambs from this herd intact, and that at the time for returning the sheep he assumed to turn back all the sheep he had received from defendants and all the lambs which had been raised from such sheep, are all circumstances which tend to corroborate his claim and testimony as to the making of this new agreement.     The evidence sustains the claim of plaintiff that a new agreement was made.     Such agreement is valid and binding on the parties.     *The Jennings Farms* v. *Watson-Higgins Milling Co.,* 218 Mich. 65; *Jacob* v. *Cummings,* 213 Mich. 373.     *   *   *

"Counsel for plaintiff is mistaken in assuming that an express guaranty or warranty might be shown. *Bayer* v. *Winton Motor Car Co.,* 194 Mich. 222.     There was, however, an implied warranty that the herd was reasonably fit and suitable for the purpose for which he intended to use it.     *Tufts* v. *Verkuyl,* 124 Mich. 242.     *   *   *   The plaintiff was justified in refusing to proceed under Exhibit A, not only because of the breach of the implied warranty, but also because of the misrepresentation as to the condition of the herd, and the fact that 1,258 sheep were not tendered to him as required by Exhibit A.

"Should the mortgage (Exhibit B) be set aside as prayed by plaintiff?     I think it should.     Mr. Byers had for years been plaintiff's legal adviser.     They had been closely associated in business deals for years. Plaintiff, to Mr. Byers' knowledge, could not read nor write.     He testified that Mr. Byers started to read the instrument; that he interrupted with objections that it did not conform to the agreement he had made with Mr. Van Ornum; that thereupon Mr. Byers told him to sign it and if it did not conform to such agreement an agreement would be drafted which would be

satisfactory to him; and that, not understanding the import of Exhibit B and relying on Mr. Byers' promise, he signed it. I think the circumstances strongly support plaintiff's claim."

We are in accord with the quoted conclusions of the trial judge. It will profit no one to review and discuss the items set forth in the decree making the accounting. After careful reading and consideration of the record and briefs, we think the account is equitable.

The decree is affirmed, with costs to plaintiff.

WIEST, C. J., and FELLOWS, McDONALD, BIRD, SHARPE, MOORE, and STEERE, JJ., concurred.