## JOHN D. GRUBER CO. *v.* SMITH.

1. Sales—Failure of Consideration—Evidence—Bills and Notes. Where plaintiff's president wrote in a letter more than two years after the sale of a gas tractor and other farm machinery that it was his experience that less than 10 per cent. of the purchasers of gas tractors were successful with them, testimony of defendant that, if he had known that fact at the time of the making of the contract he would not have bought the engine, was inadmissible, in an action on a note given as part of the purchase price, where the defense was failure of consideration through fraudulent representations and breach of warranty, since there was no evidence tending to show that at the time the sale was made plaintiff's president had any such information or experience.

2. SAME—MISREPRESENTATIONS—FRAUD—CONJECTURE.

In such action, testimony by defendant that prior to said sale plaintiff's agent had represented that the tractor and plows would plow 640 acres that spring, was inadmissible as mere conjecture.

3. SAME—DEFENSES—INSTRUCTIONS—WARRANTY—TRIAL.

It was error for the trial court to instruct the jury that if the seller, in good faith, had sold the tractor to defendant, relying on the manufacturer's warranty or guaranty, it would have a right of action against the manufacturer, since the jury might conclude that a verdict for defendant would work no injury to plaintiff.

4. SAME—EVIDENCE—CONTRACTS—INSTRUCTIONS — PAROL EVIDENCE —WRITTEN CONTRACTS.

It was error for the trial court to instruct the jury that they might consider parol testimony and correspondence between the parties as bearing upon what the original arrangement was, where the contract was in writing, was very voluminous, and expressly stated that it contained all the terms of the agreement.

5. SAME—WARRANTY—IMPLIED WARRANTY.

Where there is a written contract containing an express warranty, no other or different warranty can be implied.

6. SAME—EVIDENCE—PAROL WARRANTY—WRITTEN CONTRACTS.

Oral representations by the seller as to the power, speed, and capacity of the tractor, and cost per acre of plowing with it, were inadmissible to vary the terms of the written contract.

7. SAME—MISREPRESENTATIONS—"PUFFING."

Representations by the seller that the buyer could pay for the tractor and machinery out of the earnings and that any man of ordinary intelligence, after a few hours of instruction, could operate the same, was mere "puffing," and did not amount to fraudulent representations.

8. SAME—RESCISSION—DELAY.

Where the written contract provided the time within which the buyer could rescind if the tractor proved defective, a delay of nearly two years before attempting to rescind was wholly beyond reason.

9. SAME.

An attempt to rescind did not amount to a rescission where the buyer continued to use the outfit.

195 Mich.—22.

Error to Ionia; Davis, J. Submitted October 9, 1916. (Docket No. 90.) Decided March 30, 1917.

Assumpsit by the John D. Gruber Company against Dale A. Smith and another on a promissory note. Judgment for defendants. Plaintiff brings error. Reversed.

*Hawley & Eldred,* for appellant.

*George E. Nichols* (*A. R. Locke,* of counsel), for appellees.

The claimant is a corporation engaged, among other activities, in selling. farm implements and machinery. Its principal place of business is at Minneapolis, Minn. The defendants, residents of the same city, had, for some years prior to 1911, contemplated going farther west and entering into the farming business upon a large scale. One of the defendants, Dale A. Smith, seems to have been well acquainted with John D. Gruber, president of the plaintiff company, for many years. After very extended negotiations between the defendants and the plaintiff company, on March 21, 1911, the following order was given:

"MINNEAPOLIS, MINN., March 21, 1911.
"JOHN D. GRUBER COMPANY,
   "Minneapolis,
     "Minn.
"*Gentlemen:*
"Please deliver to me the goods described below and charge the same to my account on your books. I hereby expressly agree that title to and ownership of all property delivered on this order shall be and remain in you and the goods shall be subject to your order without any process of law until full payment shall have been made for the same. It is further understood that these goods are bought and sold subject to the manufacturer's usual warranty, and my accept-

ance of delivery shall be considered *prima facie* evidence that the said goods are in perfect order; except, it shall be understood that if any defects shall develop within a reasonable time while using said goods, and such defects can be shown, that such defective parts shall be replaced free of any charge to me. It is further agreed that interest shall be charged at the rate of eight per cent. per annum from date of delivery of goods.

"CLARENCE R. SMITH,
"DALE A. SMITH,
"Purchaser.

"F. o. b. factory.

| No. of Pieces. | Description. | Price. |
|---|---|---|
| 1—1 | 25 H. P. International gas tractor, latest model | $2,500 00 |
| 2—1 | 6 bottom Case engine gang plow with 6 breaker bottoms | 630 00 |
| 3—1 | 22 disc Hoosier double disc drill and G. D. attachment | 150 00 |
| 4—1 | 16 by 16 Case disc harrow | 40 00 |
| 5—1 | Dakota truck with box | 55 00 |
| 1 | 7 ft. Wilder clod crusher | 55 00 |

"One-half October 1, 1911, balance October 1, 1912; $400 discount for all cash 10—11.

"The above is accepted subject to the approval of John D. Gruber Co.

"JOHN D. GRUBER, President.
"Witness:   C. W. CONROY."

And on the 29th day of March, 1911, the following contract was executed:

"This contract and agreement entered into this day by and between John D. Gruber Co., a Minnesota corporation, who shall hereafter be designated as a party of the first part, and Dale A. Smith and Clarence R. Smith, who shall hereafter be designated as party of the second part, as follows to wit:

"*Sale and Purchase.*—The party of the first part does hereby bargain and sell unto the party of the second part, and the party of the second part does

hereby purchase from the party of the first part the following described farm machinery:

"1 25 H. P. international gas tractor.

"1 6 bottom Case engine gang plow with 6 breaker bottoms.

"1 22 disc Hoosier drill with grass seed attachment.

"1 16 by 16 disc harrow.

"1 Dakota farm truck with common box.

"1 7 ft. Wilder clod crusher.

"*Consideration.*—In consideration of the delivery to the party of the second part by the party of the first part of the above-described machinery free on board cars at the factories where the said machinery is manufactured, the party of the second part agrees to pay to the party of the first part, the sum of $3,430.00 lawful money of the United States in the manner and according to the terms hereinafter set forth.

"*Terms of Payment.*—The party of the second part hereby agrees to give notes to the party of the first part as follows: One note for $1,715.00 due October 1, 1911, drawing interest as described on the note; another note for $1,715.00 due October 1, 1912, and bearing interest as described on the note.

"*Discount.*—If party of the second part shall find it convenient to pay all cash for the machinery above described not later than December 1, 1911, hereby taking up both of the above-described notes, then the party of the first part shall allow to the party of the second part a discount of $400.00.

"*Title and Ownership.*—It is distinctly understood by and between both parties hereto that title to and ownership of the above-described farm machinery shall remain in the name of the John D. Gruber Co. until the same shall have been fully paid for in lawful money of the United States. Settlement by note at future dates shall not be considered as payment and shall in no way change title or ownership.

"*Collateral and Security.*—In view of the fact that the party of the second part is unable to make immediate cash payment for the above-described machinery, Dale A. Smith of the said second party hereby agrees to give to the party of the first part a warranty deed to a certain parcel of property at Lake Minnetonka, Minn., described as follows: Lots 13 by 14, block 8,

Dreamwood, Hennepin county, Minnesota, according to the plat now on file in the office of the register of deeds in said county. In addition to the above, the party of the second part hereby agrees to give to the party of the first part a chattel mortgage on all the machinery above listed, said chattel mortgage to be filed in the State and county in which the machinery above described is intended to be used, and permission is hereby given to the party of the second part by the party of the first part to transport all of the above-described machinery into Corson county, South Dakota.

"*Default in Payments.*—It is hereby understood and agreed by the party of the second part that if the said party of the second part should default in the payment of any of the maturing notes that shall be given as settlement for the above, then the party of the first part shall have the privilege and is hereby authorized by said Dale A. Smith of the second party, to indorse on the said maturing note or notes the sum of $1,000.00 as full payment and full consideration for the above-described property in Dreamwood, Lake Minnetonka, and the party of the first part shall immediately have full authority to dispose of said property as the said party of the first part may deem advisable, provided that if upon such sale a larger sum than $1,000.00 shall be realized, then in that event it is understood and agreed by the party of the first part that the party of the second part shall have the full benefit of the total amount realized from the sale of said property, less all legitimate expenses incurred in making the said sale.

"*Return of Property.*—It is hereby agreed by the party of the first part that if all of the notes hereinbefore described shall be promptly taken up by the party of the second part as they mature, then the party of the first part hereby agree promptly to deed back to the said Dale A. Smith of the second party the parcel of Lake Minnetonka property above described.

"It is hereby understood that both parties to this agreement have read each article carefully and all the conditions set forth in all the articles are hereby agreed to, and it is further agreed between both par-

ties hereto that there shall be an understanding or agreement outside of this written instrument.

"Signed, sealed and delivered in duplicate this 29th day of March, 1911.

"JOHN D. GRUBER CO.,
"By JOHN D. GRUBER, Pres.
"DALE A. SMITH,
"CLARENCE R. SMITH.
"R. B. CAMPBELL, Witness.
"LILLIAN A. JEFFERY, Witness.

"Subscribed and sworn to before me this 29th day of March, A. D. 1911.

"LILLIAN A. JEFFERY, Notary Public."

The "manufacturer's usual warranty" referred to in the customer's order follows:

"WARRANTY AND AGREEMENT.

"International Harvester Company of America (incorporated) warrants the within described engine to do good work, to be well made, of good materials, and durable if used with proper care. If upon one day's trial, with proper care, the engine fails to work well, the purchaser shall immediately give written notice to International Harvester Company of America, at Chicago, Illinois, and to the dealer from whom it was received, stating wherein the engine fails, shall allow a reasonable time for a competent man to be sent to put it in good order, and render necessary and friendly assistance to operate it. If the engine cannot then be made to work well, the purchaser shall immediately return it to said dealer, and the price paid shall be refunded which shall constitute a settlement in full of the transaction.

"Use of the engine after three days, or failure to give written notice to said company and said dealer, or failure to return the engine as above specified, shall operate as an acceptance of it and a fulfillment of this warranty. No agent has power to change the contract of warranty in any respect.

"This express warranty excludes all implied warranties, and said company and said dealer in no event shall be liable for breach of warranty in an amount exceeding the purchase price of the engine. If within ninety days' time any part proves defective, a new

part will be furnished on receipt of part showing defect."

In the month following, April, 1911, the outfit was shipped to South Dakota, where it was unloaded by defendants about April 27th, and immediately put in operation. After a trial of a day or two defendant Dale A. Smith wrote plaintiff as follows:

"The land we are plowing is somewhat rolling and rather tough in places. We are pulling the six plows on the down grade and five back on the up grade. I think the engine is a dandy, also the plows, when we get them set right. I may be hard to please but I think the plows can be made to pull easier and do better work and yet several farmers who have watched us at work say that the work can't be better."

On May 3, 1911, defendant wrote plaintiff as follows:

"The plow expert showed up Saturday and on Sunday adjusted the plow in fine shape and it is a dandy."

Then follows a detailed statement of certain engine troubles. On May 4, 1911, a letter from defendant to plaintiff contains the following:

"As you note in my last letter the plowman was here and the plows are working fine. On some of the bouts the engine pulled the six plows with lots of reserve power, but where I have hills or sharp knolls or blow outs to contend with I have to cut down the plows. She pulled five plows and the roller nicely, too."

On May 13th, defendant again wrote plaintiff a letter in which we find the following:

"Have been getting along nicely with the engine where I have been working but I can't keep supplied with gasoline as there is practically none being shipped in either at Firesteel or Isabel. * * * I have a nice job started, 80 acres, one mile long. Make a round trip in 50 minutes with four plows and roller. I had considerable trouble with the timer. Couldn't

make it stay right, but have it set tight now and think the engine is giving a good account of herself, although I am disappointed in not being able to pull more than four plows."

On May 19, 1911, defendant wrote the plaintiff a typical letter, excerpts from which follow:

"Wednesday morning we started the engine with five plows and roller because she had made easy work of four or five the day before. She worked easily with plenty of reserve—exploding from two to seven or eight times and then skipping. The average was about four and five explosions to one skip. I thought that was not working her too hard as the expert and a book he gave me said the average should be about six explosions then skip under a normal load. That forenoon we made six two mile bouts plowing about 7½ acres. That pleased me and I felt satisfied that I had the engine I wanted and could plow about 15 acres a day. After dinner we started her, filled the water tank and run about half a mile with no load but herself and she began to miss fire and stopped. We couldn't find anything wrong and after about a half hour started her with practically no trouble, plowed a little, went a mile and the same thing happened. Went over the wiring, cleaned the magneto and in about two hours she started again and run like a top, fine and dandy. After another mile she misfired and stopped again, and we couldn't start her. So I went to Isabel and wired for an expert. Aberdeen says there will be one here today and tomorrow. Yesterday afternoon my brother started it again and plowed about two rounds. This morning we have plowed about two rounds with two stops. We have hunted the darned thing over and over and can't locate the trouble—batteries, wiring, magneto, spark plugs, fuel supply, compression. Can't locate it and am mighty anxious to keep working. The engine has not given me two successive days' work of 10 hours each since I have had her without bucking. And I want to see some one get at least that much work out of her before I'll think she is worth a damn. Some of the troubles are trivals—like a connection working loose and one to be expected and I don't recall having the

same difficulty twice. * * * If the engine will only work as it has for a day and a half at a stretch I can plow 15 acres a day allowing plenty of time for oiling, wiping and looking it over, but if it is going to keep on breaking I'll be glad when I have it paid for and sold to somebody else."

Following this letter a suggestion was made by plaintiff that defendants hire an expert to operate the machine. On May 25, 1911, defendant wrote as follows:

"I have gotten two good solid days' work out of the engine without any expert. Put in new batteries, others were weak. Going fine; plowed between 14 and 15 acres yesterday. Think I will put on a night shift if gasoline comes. Forget the holler I made—I'll win out yet.

"DALE A. SMITH."

Various letters follow from defendant to plaintiff's president, until on June 19, 1911, Dale A. Smith was laid up with rheumatism. On that date he wrote a letter in which the following appears:

"I can't write my opinion of the I. H. Co.'s engines for it is uncomplimentary. I wanted one and I've got it—and got it right. But if I was a dealer in engines I would look for one that was substantial enough to work on level ground without falling to pieces. This is no reflection on you, John, but I am surprised that the I. H. Co. build a machine with so many weak features. I do not think it any reasonable excuse that others have trouble, also. No one should be justified to taking a man's good money for such inferior construction."

Defendants continued to use the outfit with indifferent success during the remainder of the season 1911, making frequent complaints to plaintiff with reference to engine trouble, but occasionally speaking hopefully. To all the letters written by defendant to plaintiff, plaintiff, through its president, replied at large, giving such advice as his experience warranted and

allowing such concessions as to payments as defendants' situation demanded. Late in October, defendants' house on the Minnesota property, which had been deeded to plaintiff as security, was destroyed by fire. The insurance on the same amounted to $500, which was paid to plaintiff and credited upon defendants' account, less $50, which was returned to defendants by plaintiff to help them through the winter. Defendants again started the outfit in the spring of 1912, and on April 24th wrote a letter to plaintiff, in which we find the following:

"The last two days I have been plowing. The engine is working good but the plowing is hard. Broke a spoke in the right driver today—the wheel with the cracked hub that I have spoken of before. Had the spoke welded and I guess it will hold all right. Only lost three hours' time but hope no more will break. The springs on the ignitor are getting worn as is the packing in the water pump so I will order those and have them on hand when I need them."

On July 8, 1912, after defendants had had the outfit in their possession for upwards of a year, in response to a letter written by plaintiff, asking what repairs they believed they were entitled to have furnished and why, defendant wrote to plaintiff to the effect that the cylinder and hubs of the drive-wheels had given evidence of defective workmanship or material. In this letter defendant said:

"Other defects in the engine such as the pump, detent arm, rocker arm, roller shifter, and various other troubles I presume are due to the type of engine and wear and tear and cannot be called defective workmanship."

On the same date, in another letter, defendant says:

"I realize fully the fine treatment I have had from you, and that the encouragement you have given me has kept my courage up when I felt more like starting the engine going and letting it run wild across coun-

try, hoping it would land in hell, if there was one for gas engines. I also realize that I have it to pay for it and I want to get as near 'value received' as possible, and I believe fully that I will be disappointed in that as the engine had never given indications of doing 50 per cent. of the work it should do in a season. I want to use it right away as I have work engaged."

During the balance of the year 1912, correspondence between the parties continued, consisting largely on the part of defendant of complaints as to the working of the engine, and on the part of the plaintiff of suggestions as to how conditions might be improved. During this period, too, there was much correspondence with reference to postponement of payments due from defendants to plaintiff on account of the engine outfit. In the spring of 1913, plaintiff caused an attachment to issue against defendants' farm in Michigan. After that time further negotiations were had between the parties as to the sale of the Michigan property and the application of the funds arising therefrom to defendants' indebtedness, but nothing appears to have been accomplished in that line.

In the present suit plaintiff seeks to recover upon one of the notes given by defendants at the time of the purchase. The defendants interposed a plea of the general issue with a notice under which they claimed to be able to show that the written contract was made and the note in suit given under and by reason of "the following representations, agreements, guaranties' and warranties upon the part of said plaintiff." Then follow averments of certain alleged verbal warranties said to have been made by plaintiff to the defendants, among them the following:

1. That the machinery sold was "all of the best make and material, and superior to all other kinds of like machinery and farm utensils, and would under all conditions and circumstances meet the representations and claims made for the same in the advertising

matter of the manufacturers thereof,. and that they, the said plaintiffs, would guarantee and warrant their statements in that respect to be true."

2. "That it [said gas tractor] would prove perfectly satisfactory in every way to said defendants, and would prove efficient in doing the work which defendants intended to accomplish therewith."

3. "That it would plow, harrow, drill and roll at least 15 acres of land per day, without annoyance, hindrances or trouble; and that said defendants could and would be able to plow 1,000 acres during any one spring season; and that said engine, and all other machinery was complete, sound, and practical in construction, and not defective in any way, and was built of good material, and sound mechanism."

The foregoing are but a few of the alleged oral warranties made by plaintiff's president to the defendants. The plea proceeds to negative each of the said alleged warranties, and claims damages on account of the failure of said alleged warranties in the sum of $5,000.

The trial started on the 8th day of February, 1915, and after it had been in progress a week, on February 15, 1915, defendant filed an amended plea and notice, setting forth, in substance, the same alleged statements contained in the original notice, but defendant claimed that said alleged statements constituted fraud, and that therefore there was no consideration for the note sued upon. Two special questions were submitted to and were answered by the jury as follows:

"(1) Q. Was there any consideration for the notes given by defendants to plaintiff?
"A. Yes.
"(2) Q. Were the defendants induced to enter into the contract of purchase of the machinery in question by the fraudulent and false statements made by the plaintiff's agents or officers?
"A. Yes."

A verdict was rendered in favor of the defendants.

BROOKE, J. (*after stating the facts*).   The first two
assignments of error argued in appellant's brief relate
to the admission of certain testimony.   While we are
of opinion that the testimony of which complaint was
made was immaterial to the issue, its admission can
scarcely be regarded as prejudicial error.

The third assignment of error relates to the follow-
ing matter:   On April 4, 1913, plaintiff's president
had written defendant a letter which contained the
following:

"Our experience with gas tractors is that less than
10 per cent. of the people who buy gas tractors of any
make whatsoever are successful.   This is our experi-
ence and we have tried them all."

Referring to this letter, defendant Dale A. Smith
was permitted, over objection, to testify that if he had
known that that had been the experience of the plain-
tiff, he would not have bought the engine.   We are
of opinion that the admission of this testimony was
erroneous, for the reason that the letter containing
the statement was dated more than two years after
the contract covering the machinery was made, and
there is no evidence in the record tending to show
that at the time the contract was made plaintiff's
president had any such information or experience.

The fourth assignment of error is based upon the
fact that defendant was permitted to testify, over ob-
jection, that plaintiff through its agents had repre-
sented prior to the sale that the outfit would plow
640 acres that spring.   This testimony was inadmis-
sible.   The statement, if made, amounted merely to
conjecture.   *Allis* v. *McLean*, 48 Mich. 428 (12 N. W.
640) ; *Truman* v. *Machine Co.*, 169 Mich. 153 (135
N. W. 89).   In the course of the charge the following
language appears:

"It appears from the testimony in the case that the
defendants never entered into any contract with the

International Harvester Company or any other manufacturing concern in relation to this machinery or outfit; that the order as originally given was to John D. Gruber Company, and accepted by said John D. Gruber Company, the plaintiff, and the only right of action or defense by way of no consideration for the notes or recoupment of damages is against the said John D. Gruber Company, and the defendants are not obliged in any way to look to any other concern, corporation, or person. If John D. Gruber Company acted in good faith and sold this machinery, including this tractor engine, to the defendants relying upon the manufacturer's guaranty or warranty, and that has not been fulfilled, then and in that case they might have an action against the manufacturer, but the defendants must look directly and only to John D. Gruber Company."

This instruction would seem to be clearly erroneous. The action at bar is between the John D. Gruber Company and the defendants Smith. The rights of either of the parties over against third persons not parties to the action are wholly immaterial. Upon this instruction the jury might very well conclude that a verdict in favor of the defendants would work no injury to plaintiff who might recover therefor against the manufacturer, the International Harvester Company. The court further charged:

"Also take into consideration this voluminous correspondence it has taken some days to read in your presence, not for the purpose of taking the representations that were made in these letters to vitiate and set aside this contract, but for the purpose of throwing light upon what the real contract and arrangements were, what the representations really were made by the plaintiff and bearing upon the probability or improbability of whether the defendants believed and relied upon what the plaintiff said in that connection. How did the plaintiff treat this subject by virtue of this correspondence, does that throw light upon what the original arrangement was and what the representations were. How does the defendant in that corre-

spondence treat the question. As though he understood what this machinery was, its quality, its condition, and its character and its efficiency and what it would do? Or did he rely entirely and rest entirely upon the strength of the statements made by the plaintiff's agent Gruber, when he made this contract? And so you are to consider the testimony orally given by these parties and the several witnesses upon this question they gave in the depositions for the purpose of ascertaining what light you can receive upon the original arrangement. What was it? It is not to be set aside because of any representations made in the letters; they are only to be received as bearing upon what the original arrangement was; whether fraud, deceit, and deception was practiced by the plaintiff at that time, or whether there was later, under the consideration of the matters or arrangements, whether it was sold with a certain guaranty the law implies, and whether there has been damage suffered by defendants without fault on their part."

We think error is properly assigned upon this portion of the charge. The contract in question in the case was very voluminous, was in writing, and expressly states that it contains all the terms of the agreement. Under these circumstances it was clearly improper to permit the jury to consider the correspondence or the testimony as an aid in determining what the original contract was, when the parties thereto had reduced that contract to writing. *Day Leather Co.* v. *Leather Co.,* 141 Mich. 533 (104 N. W. 797); *Detroit Shipbuilding Co.* v. *Comstock,* 144 Mich. 516 (108 N. W. 286).

With reference to warranty the court charged as follows:

"If you find that the defendants fully and fairly stated to the plaintiff, through its agents and representatives, the purpose and object of the purchase and the use that they expected to make of this machinery, and that the plaintiff through its agents and representatives fully understood the purpose, object, and intention and expectations of the defendants, and

thereupon recommended and sold to the defendants the outfit in question, an implied warranty by law was created which was to the effect—that is, the law says that the machinery would do and perform the work, and it should be adequate and efficient for the purpose for which it was purchased. * * * But it makes no difference in this case whether the defendant saw this manufacturer's guaranty or warranty or not, because there is an implied warranty that this, as well as all machinery or other property, where the seller knows the purchaser is buying the property for a special purpose and use, that the machinery and property will meet the requirements and is suitable and efficient for that purpose, and of a kind, character, and condition qualified for such use."

In so instructing the jury, the court was clearly in error. We have many times held that where there is a written contract containing an express warranty, no other or different warranty can be implied: *Hall* v. *Car Co.*, 168 Mich. 634, 640 (135 N. W. 118); *Remy, Schmidt & Pleissner* v. *Healey*, 161 Mich. 266 (126 N. W. 202, 29 L. R. A. [N. S.] 139, 21 Am. & Eng. Ann. Cas. 74); *Hallwood Cash Register Co.* v. *Millard*, 127 Mich. 316 (86 N. W. 833); *Dowagiac Manfg. Co.* v. *Corbit*, 127 Mich. 473 (86 N. W. 954, 87 N. W. 886); *D. M. Osborne & Co.* v. *Wigent*, 127 Mich. 624 (86 N. W. 1022); *National Cash Register Co.* v. *Blumenthal*, 85 Mich. 464 (48 N. W. 622); *Nichols, Shepard & Co.* v. *Crandall*, 77 Mich. 401 (43 N. W. 875, 6 L. R. A. 412).

The jury found in favor of the defendants, because according to their answer to the second special question the contract was induced by fraudulent representations made by plaintiff's agent. These representations, according to the testimony, and briefly stated, consisted in the following:

(1) That the engine had sufficient power to haul six gang plows with breaker bottoms, a packer, and a drill.

(2)  That it had ample power to haul the same at the rate of 2 to 2½ miles an hour.

(3)  That it would plow at least an acre an hour.

(4)  That the said defendants could pay for the said machinery and outfit out of the earnings of the same.

(5)  That any man of ordinary intelligence, after a few hours of instruction, could operate the same.

(6)  That the engine and machinery were first-class and the best that was made, and would be sufficient to meet all the requirements and demands of said defendants in their operation of plowing, as stated by the plaintiff.

(7)  That it would plow an acre per hour at a cost not to exceed a dollar an acre (Amended plea, Rec. p. 11).

It is a fact worthy of note that in the very voluminous correspondence carried on during a period of two years between the defendants and the plaintiff, defendants at no time charged plaintiff's agent who effected the sale with any misrepresentation in connection therewith.

With reference to Nos. 1, 2, 3, and 7 the representations, even if made orally, before the execution of the contract, would clearly fall within our holding in the case of *Detroit Shipbuilding Co.* v. *Comstock, supra,* and *Linderman Machine Co.* v. *Shaw-Walker Co.,* 187 Mich. 28 (153 N. W. 34).

Nos. 4 and 5 fall within that class of representations commonly known as "puffing," and No. 6 is covered by the written warranty in the contract itself.

It is the claim of defendants that the contract was rescinded in October, 1912, after two full seasons of operation.  Aside from the fact that the contract itself provides for the time in which defendants may rescind after trial, it is clear that such delay as was indulged in by the defendants in this case is wholly beyond reason.  *Gill & Co.* v. *Gaslight Co.,* 172 Mich. 295 (137 N. W. 690) ; *Emert* v. *Nibblink,* 179 Mich. 335 (146 N. W. 120).

In addition to this, after the alleged rescission, defendants continued to use the outfit, plowing 75 or 80 acres with it in the spring of 1913 and doing further work with it during 1914. Under our own authorities, rescission under such circumstances is impossible. *Kupfer* v. *Clothing Co.*, 141 Mich. 325 (104 N. W. 582) ; *Hakes* v. *Thayer*, 165 Mich. 476 (131 N. W. 174) ; *Linderman Machine Co.* v. *Shaw-Walker Co.*, *supra.*

Under the proof as it appeared at the close of the testimony in this case, we are of opinion that the plaintiff's first request to charge, which was for a directed verdict in its favor, should have been given.

The judgment is reversed, with costs, and a new trial ordered.

KUHN, C. J., and STONE, OSTRANDER, MOORE, and STEERE, JJ., concurred. BIRD and PERSON, JJ., did not sit.