CENTRAL SAVINGS BANK & TRUST CO. *v.* STOTTER.

1. BILLS AND NOTES—BONA FIDE HOLDER—NOTICE—BANKS AND BANKING.

 A bank which discounts a note for a customer, crediting the proceeds thereof to his account, is not a *bona fide* purchaser for value, unless such credit was drawn upon before the maturity of the note, and before notice of facts invalidating it in the hands of the payee.

2. SAME—EVIDENCE OF FRAUD—ADMISSIBILITY—DIRECTED VERDICT.

 Where, in an action upon promissory notes by the transferee thereof, there was proof of fraud in the inception, and upon the record the plaintiff failed to establish its *bona fide* holding, the court below was in error in striking out the evidence of fraud and directing a verdict for plaintiff.

Error to Wayne; Mandell, J. Submitted June 13, 1919. (Docket No. 44.) Decided October 6, 1919.

Assumpsit by the Central Savings Bank & Trust Company against Isadore J. Stotter and others on certain promissory notes. Judgment for plaintiff on a directed verdict. Defendants bring error. Reversed.

*Sid A. Erwin* (*Samuel Shimans,* of counsel), for appellants.

*Frank D. Andrus,* for appellee.

STONE, J. This case was brought here to review a judgment for the plaintiff, upon a directed verdict. It is an action on three promissory notes executed by the defendants to one Luther B. Watson on September 8, 1916, due six months thereafter. The plaintiff claims to be a *bona fide* holder for value of these notes. The notes were indorsed over by Watson, the payee, to the plaintiff on February 26, 1917. They were due March 8, 1917. The plaintiff sent these notes, on

February 26th, to the German National Bank of Cincinnati to be forwarded by the latter to the First and Old Detroit National Bank for collection. And the loose leaf discount sheet of the plaintiff shows that these notes were entered on the discount sheet on February 28, 1917.

In 1915 said Watson, the payee, and Robert Wachman, one of the makers, as co-partners, were dealing in certain automobile accessories in the city of Detroit, under the name of the Jiffy Starter Company and the Evapco Company. Subsequently, both of these companies were incorporated, and at first they interested Sid A. Erwin, one of the appellants herein, and later they interested Isadore J. Stotter, the other appellant. At this time, Mr. Schulte, the president of the plaintiff, Mr. Hermes, the secretary and treasurer of the plaintiff, and Mr. Schweikart, a director, held stock in the Jiffy Starter Company—Mr. Hermes owning 150 shares, Mr. Schulte 100 shares, and Mr. Schweikart 175 shares. At the time the notes in suit were indorsed over to the bank, these three men were still connected with the bank in the capacities above described.

The transactions which led to the giving of the notes sued upon were as follows: During the early part of September, 1916, Watson and Wachman were attempting to raise money to enlarge the business, and Mr. Stotter was talked of as a "prospect" to buy part of the treasury stock, which at that time amounted to approximately $10,000. Mr. Stotter at that time purchased $5,000 worth of this $10,000 stock, paying at that time $2,500 in cash on the purchase price. In the latter part of August, or the early part of September, 1916, Wachman suggested to the appellants that they (meaning himself and the two appellants) should get rid of Watson, and that it would be a good thing to take up his stock, and also the stock of the

officials of the plaintiff bank. Prior to that time Watson and Wachman had been representing to Stotter and Erwin the very profitable business they were doing; that they were doing a business of about $400 or $500 a day, with the profits in excess of $100 a day. Watson, in September, 1916, represented that the assets of the Jiffy Starter Company and the Evapco Company were in the neighborhood of $30,000 with only current bills owing, for the purpose of inducing the appellants to purchase the stock of Watson, his wife, and that of the officials of the plaintiff. He produced a list of alleged accounts, aggregating $17,058.30, and an assignment of a claim for $3,000 which the Jiffy Starter Company was supposed to have against another concern. Arrangements were then made to purchase said stock at the rate of $7.50 a share. Watson claimed that he would have to go down to Covington, Kentucky, and get the stock of the bank officials. He brought the stock back indorsed in blank, and Stotter went to the First and Old Detroit National Bank, and paid Mr. Watson about $8,000 in cash, and he and Erwin, the other appellant, and defendants Wachman and White, executed and delivered to Watson the three notes in suit,—balance of the purchase price. About a week or ten days after this transaction, to wit: about September 21, 1916, the appellants became suspicious of the solvency of the Jiffy Starter Company and the Evapco Company, and, upon investigation, found that both concerns were in a serious financial condition; that there was no money on hand; and a Mr. Isenhart was put in charge, and upon investigation it was found that the list of accounts receivable, upon the strength of which the stock was purchased, were not *bona fide*, and that the $3,000 account never existed. It was found that the total assets of both companies amounted to $847 only. The representations of Watson, as to the worth of

the accounts receivable, were also made in the presence of Mr. Hart, vice president of the First and Old Detroit National Bank. Mr. Schulte, the president of the plaintiff, testified that Watson purchased his stock, as well as the stock of the other officials of the plaintiff at $7.50 a share; that they had paid $5 a share and that they made $2.50 a share; and that the company never declared a dividend, but that he never knew that the company never made a profit. The plaintiff bank claims to have discounted these notes on February 26, 1917, and either permitted Watson to draw against the amount of said discount or to have applied it in payment of an antecedent debt. Upon direct examination Mr. Schulte, the president of the plaintiff, testified that Watson was a customer of the bank, and had been doing business with it for 12 years, and that at the time it discounted the note it gave him credit in the usual manner of banking; and that the notes were placed to the credit of Watson. He testified:

"When I took the notes from Mr. Watson I did not know that there were any equities existing in the favor of the makers as against the payee. I took the notes in the usual course, and discounted them and gave Mr. Watson credit for them."

On cross-examination he testified:

"Q. Did you give him full credit for the face of the notes?
"A. I discounted them.
"Q. How much money did you pay him on that occasion?
"A. The full face of the note.
"Q. How—in cash?
"A. I gave him credit on his account.
"Q. What was the state of his account at that time —did he owe you money?
"A. He owed us money.
"Q. How much?
"A. I could not give that. I cannot say whether

he owed us $2,000 at that time or not. He was given credit for that amount, whether it was for payment of his note that he might have paid it later—I don't know if that is the amount of his note or not. I don't know whether he owed that amount or not. He may have owed the bank more." * * *

Upon being recalled he testified:

"When we received these notes we placed them to the credit of Mr. Watson, the payee, the full amount of these notes to his credit. As a matter of fact, the notes themselves were not discounted; they were placed to his credit—the whole thing, the whole amount, including the interest up to that date. We allowed Mr. Watson to check against that account, and he did check against it. He had the full benefit of the entire amount."

The witness also testified that he could not state what Mr. Watson's account was on February 27th.

It is stated by defendants' counsel that neither defendant Wachman nor White defended the suit, and, as we understand it, only the defendants Stotter and Erwin have appealed. The trial court received the testimony relating to the transactions leading up to the giving of the notes, against the objection of the plaintiff, and with the understanding that it would be stricken out, if defendants did not bring knowledge or notice to the plaintiff of the fraud of the payee of the notes. At the close of the testimony the court struck out such testimony and directed a verdict for the plaintiff for the full amount of the notes, to wit, $2,313.43.

By their brief counsel for appellants contend:

(1) That the plaintiff did not, as matter of law, sustain the burden of proof, that it was a *bona fide* holder for value of the notes in suit. (Assignments of error Nos. 7 and 9.)

(2) That the question of the plaintiff's *bona fides* should have been left to the jury. (Assignments of error Nos. 3, 4 and 5.)

(3) That the court erred in striking out the testimony of Erwin and Stotter, as to the fraud committed by Watson in the procurement of the notes in suit; in permitting Schulte to refresh his recollection from a loose leaf ledger sheet of the bank; and in the exclusion of exhibits 14 and 15. (Assignments of error Nos. 1, 10 and 12.)

In support of their first proposition appellants call attention to sections 54, 57 and 61 of the negotiable instruments law, being sections 6093, 6096 and 6100, 2 Comp. Laws 1915, and claim that where it is shown that negotiable paper is of fraudulent inception, the burden of proof is on the holder to establish his *bona fides*, citing *Detroit Nat. Bank* v. *Union Trust Co.*, 145 Mich. 656; *Thompson* v. *Village of Mecosta*, 127 Mich. 528, and *Mace* v. *Kennedy*, 68 Mich. 389.

It is contended that the plaintiff did not sustain the burden of proof that it took the notes in good faith and for value. And counsel say:

"Carefully scrutinizing and examining the entire testimony of the plaintiff, both on direct and cross-examination, it is impossible to gather definite information as to just what the plaintiff gave up for these notes. What was the nature of the antecedent debt? Was the antecedent debt due at that time? Perhaps, if the nature of the antecedent debt were disclosed, it would be found that it was no debt at all, and therefore that the plaintiff gave no consideration for these notes. If, on the other hand, we proceed on the assumption that the payee, Watson, drew against the discount, are we not entitled to know the nature and amounts of his drafts, and the dates thereof, and in this connection it is very important to note that the alleged discount was entered on the books on the 28th day of February, eight days before the notes were due. Did Watson exhaust this alleged discount when the plaintiff bank was informed of the protest of these notes, presumptively about nine or ten days later?"

It is the claim of the plaintiff that:

(1) The notes in suit were regularly executed by defendants and delivered to payee Watson, who negotiated and transferred them to the plaintiff for a valuable consideration before maturity.

(2) That there was nothing on the face of the notes to cast any suspicion on their character.

(3) That plaintiff received said notes in due course, and without knowledge of any infirmity in the title of the payee.

And the line of cases beginning with *Bostwick* v. *Dodge,* 1 Doug. 413; *Outhwite* v. *Porter,* 13 Mich. 533, and ending with *Drovers' Nat. Bank* v. *Potvin,* 116 Mich. 474; *Armstrong* v. *Stearns,* 156 Mich. 597, and *Hakes* v. *Thayer,* 165 Mich. 476, are cited.

The infirmity in the plaintiff's case, as it appears to us, is that it does not appear from this record when this account to the credit of which these notes were placed was drawn upon or exhausted; whether before or after the maturity of the notes, or before or after notice of the fraud, or protest. We have searched in vain for such evidence.

In *Drovers' Nat. Bank* v. *Blue,* 110 Mich. 31 (64 Am. St. Rep. 327), it was held that a bank which discounts a note for a customer, crediting the proceeds thereof to his account, is not a *bona fide* purchaser for value, unless such credit was drawn upon before the maturity of the note, and before notice of facts invalidating it in the hands of the payee. In that case Justice HOOKER, speaking for this court, said:

"The testimony shows that no money or valuable thing passed at the time of the purchase. A mere credit was given by the bank for the note—a promise to pay, in other words; and there is nothing to show that this credit was ever drawn upon, or that the account of which it became a part was exhausted before the maturity of the note, or before notice of the fraud. This did not show the bank to be a purchaser for value, within the rule"—citing authorities.

The converse of the rule is stated in *Fredonia Nat. Bank* v. *Tommei,* 131 Mich. 674, where it was held that a bank which discounts a promissory note, crediting the proceeds to the indorser's account, which becomes exhausted before the maturity of the note, is a purchaser for value, notwithstanding the indorser subsequently has deposits equal to the amount of the note.

Section 56 of the negotiable instruments law (2 Comp. Laws 1915, § 6095) provides that where the transferee receives notice of any infirmity in the instrument, or defect in the title of the person negotiating the same before he has paid the full amount agreed to be paid therefor, he will be deemed a holder in due course only to the extent of the amount theretofore paid by him.

We are of the opinion that upon this record the court erred in holding that the plaintiff was a holder for value, as matter of law, and in striking out the testimony of the said defendants, and in directing a verdict and judgment for the plaintiff.

The judgment below is reversed and a new trial granted, with costs to appellants.

BIRD, C. J., and MOORE, STEERE, BROOKE, FELLOWS, and KUHN, JJ., concurred.

The late Justice OSTRANDER took no part in this decision.